1   Mark P. Bailus, SBN 2284
    Marc P. Cook, SBN 4574
2   George P. Kelesis, SBN 69
    **BAILUS COOK & KELESIS, LTD.**
3   400 South Fourth Street, Suite 300
    Las Vegas, Nevada 89101
4   Telephone: (702) 737-7702
    Facsimile: (702) 737-7712
5   Email: mcook33@cox.net
    Office Email: cnklawfirm@aol.com
6   *Local Counsel*

7   Robert L. Brace, SBN 122240
    Michael P. Denver SBN 199279
8   **HOLLISTER & BRACE, P.C.**
9   P.O. Box 630
    Santa Barbara, California 93102
10  Telephone: (805) 963-6711
    Facsimile No. (805) 965-0329
11  Email: rlbrace@hbsb.com
12  *Attorneys for Plaintiffs JON R. SORRELL AND MARIE L. SORRELL,
     as Trustees of the Jon and Marie Sorrell Trust, dated May 23, 2001;*
13  *S & V PROPERTIES, a California Corporation; DANIEL R. MILLER,
    an individual; SCARONI PROPERTIES, a California Corporation;*
14  *SCCAA Holdings, LLC, a Nevada Limited liability company;
    and all others similarly situated.*
15

16  Thomas G. Foley, Jr., SBN 65812
    Peter J. Bezek, SBN 102310
17  Robert Curtis SBN 203870
    **FOLEY, BEZEK, BAILEY & CURTIS, LP**
18  15 W. Carrillo Street
    Santa Barbara, California 93101
19  Telephone: (805) 962-9495
    Facsimile: (805) 962-0722
20  Email: tfoley@foleybezek.com
21  *Attorneys for Howard Hawkes Trust UTA Dated
    November 1, 1991, individually and on behalf of all others*
22  *similarly situated.*

23

24                    **UNITED STATES DISTRICT COURT**

25                       **DISTRICT OF NEVADA**

26

27

28

---

**CONSOLIDATED CLASS ACTION COMPLAINT**

JON R. SORRELL AND MARIE L. SORRELL, as Trustees of the Jon and Marie Sorrell Trust, dated May 23, 2001; S & V PROPERTIES, a California Corporation; DANIEL R. MILLER, an individual; SCARONI PROPERTIES, a California Corporation; SCCAA Holdings, LLC, a Nevada Limited liability company; HOWARD J. HAWKES TRUST, UTA Dated November 1, 1999,and all others similarly situated

Plaintiffs,

vs.

QUALIFIED EXCHANGE SERVICES, INC., a California corporation; SOUTHWEST EXCHANGE, INC., a Nevada corporation; BLACKSTONE LIMITED, LLC, a Delaware limited liability company; CAPITAL REEF MANAGEMENT CORPORATION, a Delaware limited liability company; CITIGROUP GLOBAL MARKETS, INC., FKA SALOMON SMITH BARNEY, INC., a Delaware corporation; GLOBAL AVIATION DELAWARE, LLC, a Delaware limited liability company; INTERNATIONAL INTEGRATED INDUSTRIES, LLC, a Nevada limited liability company; SILVER STATE BANK, a Nevada corporation; PETER JOHN DEMARIGNY, an individual; DONALD KAY MCGHAN, an individual; JIM J. MCGHAN, an individual; NIKKI M. POMEROY, an individual; NIKKI M. POMEROY, as Trustee of the POMEROY LIVING TRUST; MARC S. SPERBERG, an individual; MARK E. BROWN and THOMAS Y. HARTLEY, as the BOARD OF DIRECTORS of MEDICOR, LTD., KYLEEN M. DAWSON; MEGAN L. AMSLER; AND BETTY A. KINCAID; and THEODORE R. MALONEY

Defendants.

CASE NO. 07-CV-01394-RCJ-LRL

**CONSOLIDATED CLASS ACTION COMPLAINT**

1.  **VIOLATIONS OF 18 U.S.C. § 1962 (c) - CIVIL RICO;**

2.  **VIOLATIONS OF 18 U.S.C. § 1962 (d) CONSPIRACY TO COMMIT CIVIL RICO;**

3.  **THEFT/CONVERSION/ EMBEZZLEMENT;**

4.  **AIDING AND ABETTING CONVERSION AGAINST DEFENDANTS SMITH BARNEY AND SILVER STATE BANK;**

5.  **RECEIVING STOLEN PROPERTY;**

6.  **FRAUD & DECEIT;**

7.  **NEGLIGENT MISREPRESENTATION;**

8.  **BREACH OF CONTRACT;**

9.  **BREACH OF FIDUCIARY DUTY AND AIDING BREACH OF FIDUCIARY DUTY;**

10. **NEGLIGENCE;**

11. **NEGLIGENCE PER SE; and**

12. **FOR NEGLIGENT SUPERVISION AGAINST DEFENDANT SMITH BARNEY**

# TABLE OF CONTENTS

**Page(s)**

I.      NATURE OF THE ACTION .................................................................. 1

II.     JURISDICTION AND VENUE .......................................................... 1-2

III.    PARTIES ........................................................................................ 2-19

     A.      Plaintiffs ............................................................................ 2-3

     B.      Defendants ....................................................................... 3-19

IV.     AGENCY AND CONSPIRACY ALLEGATIONS ........................ 19-20

V.      INFORMATION ALLEGATIONS ................................................... 20

VI.     THE BUSINESS OF 1031 EXCHANGES ...................................... 21-22

VII.    GENERAL FACTUAL ALLEGATIONS ABOUT THE EXCHANGE
     ACCOMMODATOR DEFENDANTS ............................................ 22-23

VIII.   ALLEGATIONS REGARDING THE CONSPIRACY TO STEAL
     THE TRUST FUNDS OF THE CLIENTS OF THE EXCHANGE
     ACCOMMODATORS .................................................................... 23-62

IX.     ALLEGATIONS REGARDING NEGLIGENCE BY THE MEDICOR
     BOARD OFFICERS ...................................................................... 63-70

X.      CLASS ACTION ALLEGATIONS ................................................ 71-74

XI.     CAUSES OF ACTION .................................................................... 74-87

     **First Claim for Relief -- Violation of 18 U.S.C. §1962(c) - - Civil RICO**
     (Against the Thief Defendants, Smith Barney and the Non-BFP Transferee
     Defendants) .................................................................................... 75-79

     **Second Claim for Relief --Violation of 18 U.S.C. §1962(d) -- Conspiracy**
     (Against the Thief Defendants, Smith Barney and the Non-BFP Transferee
     Defendants) ........................................................................................ 79

     **Third Claim for Relief -- Theft/Conversion/Embezzlement**
     (Against the Thief Defendants and the Non-BFP Transferee Defendants ....... 79-80

     **Fourth Claim for Relief --Aiding and Abetting Conversion**
     (Against Defendants Smith Barney and Silver State Bank) ........................... 80-81

**Fifth Claim for Relief -- Receiving Stolen Property**
(Against the Thief Defendants and Non-BFP Transferee Defendants) ................ 81

**Sixth Claim for Relief -- Fraud and Deceit**
(Against Thief Defendants and Smith Barney and Silver State Bank) ................. 82

**Seventh Claim for Relief -- Negligent Misrepresentation**
(Against the Exchange Accommodator Defendants, the Thief Defendants
and Smith Barney) ....................................................................................... 82-83

**Eighth Claim for Relief -- Breach of Contract**
(Against SWX and QES) ................................................................................. 83-84

**Ninth Claim for Relief -- Breach of Fiduciary Duty and Aiding Breach of Fiduciary Duty**
(Against all Defendants) .................................................................................. 84

**Tenth Claim for Relief -- Negligence**
(Against Hartley and Brown) ........................................................................... 84-85

**Eleventh Claim for Relief – Negligence Per Se**
(Against the Defendant SWX for Violation of NRS §205.960, and Against the
Thief Defendants, Smith Barney and Silver State Bank for Aiding and Abetting
SWX's Violation of NRS §205.960) ................................................................. 85-86

**Twelfth Claim for Relief – Negligent Supervision**
(Against Defendant Smith Barney) ................................................................... 86-87

XII.     **PRAYER FOR RELIEF** .................................................................... 87-88

ii

Plaintiffs for themselves individually and as class representatives of the class and Sub-Class of claimants as defined herein allege with particularity pursuant to Federal Rule of Civil Procedure 9(b) as follows:

## I.

## NATURE OF THE ACTION

1.      This is a Class Action brought by Plaintiffs on behalf of approximately 133 people located in Nevada and throughout the United States who each lost substantial money ($97 million) entrusted to certain intermediaries ("Exchange Accommodators") (also referred to as "Qualified Intermediaries") to facilitate their respective Internal Revenue Code Section 1031 exchanges ("1031 exchanges").   An organized crime family discovered that these Exchange Accommodators were unregulated businesses holding large sums of cash that needed ready access to only a small percentage of the money to operate as going concerns.  Pursuant to a conspiracy, this family of thieves formed a RICO enterprise comprised of family members and confederates with the goal of purchasing several Exchange Accommodators to gain access to their funds held in trust and then steal the majority of those funds for personal gain.  The RICO enterprise operated from January of 2004 until late January 2007, causing over $97,000,000 in damages which was exposed when the real estate market finally cooled, imposing a de facto audit of the looted trust.  Plaintiffs' Complaint is brought against the thieves and those that helped them as well as the Exchange Accommodators who lost the money due to the wrongful conduct alleged.

## II.

## JURISDICTION AND VENUE

2.      This Federal District Court may exercise jurisdiction over this Class Action pursuant to 28 U.S.C. §1331, supplemental jurisdiction pursuant to 28 U.S.C. §1367 and the Class Action Fairness Act of 2005 codified in part at 28 U.S.C. §1332(d) and §1453. The matter is a complex Class Action.

3.      This Court has personal jurisdiction over all of the Defendants named in this Complaint because they either conducted business in Nevada, were fiduciaries or recipients of

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\WK3\7269.001- (SORREL) W7269.002 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1  funds held in trusts created in Nevada, and participated in a criminal enterprise which injured

2  citizens of numerous states, including Nevada.   Venue is proper in this Court because

3  individual 1031 exchange trusts were created in Nevada, conduct at issue took place and had an

4  effect in Nevada, and certain Defendants resided in Nevada or have their principal place of

5  business here.

## III.

## PARTIES

**A.    Plaintiffs**

4.     Plaintiffs **Jon R. Sorrell and Marie L. Sorrell** are Trustees of the Jon and Marie Sorrell Trust dated May 23, 2001 (the "Sorrell Trust"), and individuals living and doing business in Santa Barbara County.  The Sorrell Trust owned real property in Lake Arrowhead, California (the "relinquished property") which was sold on September 8, 2006 with the equity from the sale deposited in trust with Qualified Exchange Services, Inc. ("QES") to facilitate the purchase of like kind property in Santa Ynez, California (the "replacement property").   The Sorrell Trust lost $719,610.98.

5.     Plaintiff **SCCAA Holdings, LLC ("SCCAA")** is a Nevada Limited liability company doing business in Clark County, Nevada which owned real property in Henderson that was sold with the equity from the sale deposited in trust with Southwest Exchange, Inc. ("SWX") on January 3, 2007 to facilitate the purchase of like kind replacement property in Texas.  SCCAA lost $2,742,581.18.

6.     Plaintiff **S & V Properties, Inc. ("S&V")** is a California Corporation doing business in Aptos, California which owned real property in Boulder City, Nevada that was sold with the equity from the sale deposited in trust at SWX on December 2, 2006 to facilitate the purchase of like kind property.  S&V lost $1,029,358.94.

7.     Plaintiff **Scaroni Properties, Inc. ("Scaroni")** is a California Corporation doing business in Aptos, California which owned real property in Boulder City, Nevada that was sold with the equity from the sale deposited in trust at SWX on December 20, 2006 to facilitate the purchase of like kind property.  Scaroni lost $361,666.65.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\WK7269.001- (SORRELL)\7269.007 Transferred Litigation USDC Nev. Case No. 013941Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

8.     Plaintiff **Daniel R. Miller ("Miller")** resides in Garberville, California and was the owner of property in Sparks, Nevada which was sold in September 2006 and Lacy, Washington which sold in December 2006, the equity of which was deposited with SWX to facilitate the purchase of replacement property in Garberville, California. Miller lost $258,000.

9.     Plaintiff **Hawkes Trust ("Hawkes Trust")** is a revocable trust formed on November 1, 1991, which trust owned real property in California, which property was sold in 2006. Plaintiff Hawkes Trust entered into a written exchange agreement with defendant QES on December 8, 2006, pursuant to which $770,070.99 was transferred to QES. The Hawkes Trust lost $770,070.99 based on the wrongful conduct alleged in this Class Action Complaint.

**B.**     **Defendants**

**(i)**     **The Exchange Accommodator Defendants**

10.     Defendant **Southwest Exchange, Inc. ("SWX")** is a Nevada corporation, headquartered at 2370 Corporate Circle in Henderson, Nevada near Las Vegas. SWX is a 1031 Exchange Accommodator, which is a trustee, doing business as Southwest Exchange Corporation and Southwest 1031 Exchange.

11.     The regulations promulgated by the Treasury Department to implement IRS §1031 set forth "safe harbors" the use of which will result in a determination that the taxpayer (herein after referred to as an "Exchanger") is not in actual or constructive receipt of money or other property for purposes of §1031. Included among the safe harbors identified in Treasury Regulation §1.1031(k)-1(g)(3) and (4) are transactions in which the cash resulting from the sale of a relinquished real property is held in a "qualified escrow account" or "qualified trust," or the sale proceeds are held by a "Qualified Intermediary." Subsection (g) of Treasury Regulation §1.1031(k)-1 provides that more than one safe harbor can be used in the same deferred exchange.

12.     The State of Nevada enacted N.R.S. §205.960 which provided in 2004 that it was unlawful for a person to enter into an agreement to act as a Qualified Intermediary to hold the money of another person pursuant to an exchange of property which is purported to be tax free pursuant to 26 U.S.C. §1031 unless the money was deposited by the intermediary in a qualified

**CONSOLIDATED CLASS ACTION COMPLAINT**

1   escrow account as defined in 26 C.F.R. §1.1031(k)-(g), and the money was held in the escrow

2   account in such a manner that it could not be withdrawn from the escrow account without the

3   written approval of both the intermediary and the Exchanger for whom the intermediary is

4   holding the money. A "qualified escrow account" is defined in Treas. Reg. §1.1031(k)-

5   1(g)(3)(ii) as an account wherein the escrow holder is not the taxpayer or a disqualified person

6   (as defined in paragraph (k) of the regulation), and the escrow agreement expressly limits the

7   Exchanger's rights to receive, pledge, borrow, or otherwise obtain the benefits of the cash or

8   cash equivalent held in the escrow account as provided in subparagraph (g)(6) of §1.1031(k)-1.

9       13.   SWX entered into an "Exchange Agreement" with each of its Exchanger clients,

10   (including some of the persons identified above as Plaintiffs) whereby SWX as a trustee agreed

11   to temporarily hold the Exchanger's funds received from the sale of their "Relinquished

12   Property" in an FDIC insured account while the Exchanger located and identified a

13   "Replacement Property" to be acquired to defer capital gains taxes.  At all times relevant to this

14   case, SWX was obligated to comply with Nevada Revised Statutes ("NRS") §205.960 which

15   required all SWX clients' funds to be deposited into a qualified escrow account and the money

16   so deposited could not be withdrawn from the escrow account without the written approval of

17   the client of SWX. The provisions of the Exchange Agreements utilized by SWX expressly limit

18   the client's rights to receive, pledge, borrow, or otherwise obtain the benefits of the cash or cash

19   equivalent held by SWX as provided in subparagraphs (g)(3) and (g)(6) of Treas. Reg.

20   §1.1031(k)-1, and was therefore an "escrow agreement" as defined in §1.1031(k)-1(g)(3).

21   Defendant SWX as an escrow holder pursuant to the terms of its Exchange Agreement owed the

22   duties of an escrow holder to its Exchanger clients in addition to the duties that SWX owed its

23   Exchanger clients as a trustee.

24       14.   SWX did not comply with its trustee duties, the exchange agreements or NRS

25   §205.960, but instead commingled the clients' trust money in several bank accounts at defendant

26   Silver State Bank and then transferred the clients' money to various brokerage houses without

27   client consent whereafter the money was looted as further alleged in this Complaint.

28   ///

**CONSOLIDATED CLASS ACTION COMPLAINT**

16.     Defendant **Qualified Exchange Services, Inc. ("QES")** is a California corporation headquartered at 1155 Coast Village Road in Santa Barbara, California.  QES acts as an Exchange Accommodator, a trustee, holding the funds of its clients in trust after the sale of their real property (the "Relinquished Property") while the clients locate and purchase like kind property (the "Replacement Property").  Pursuant to the terms of the written Exchange Agreement utilized by QES, the trust funds were to be transferred from QES to the escrow account opened for the purchase of the Replacement Property in order for the escrow to close pursuant to the terms of the trust document labeled an "Exchange Agreement." The provisions of the Exchange Agreements utilized by QES expressly limit the Exchanger client's rights to receive, pledge, borrow, or otherwise obtain the benefits of the cash or cash equivalent held by QES as provided in subparagraphs (g)(3) and (g)(6) of  Treas. Reg. §1.1031(k)-1, and was therefore an "escrow agreement." Defendant QES as an escrow holder pursuant to the terms of its Exchange Agreement also owed the duties of an escrow holder to its Exchanger clients in addition to the duties owed to its Exchanger clients as a trustee.  On or about October 20, 2006, SWX became affiliated with QES, obtained access to funds held in trust by QES for clients of QES, and became a co-obligor of the contractual and fiduciary obligations owed by QES to its clients.  Thereafter the QES clients' funds were looted as further alleged in this Complaint.

**(ii)     The Thief Defendants**

17.     Defendant **Donald K. McGhan ("McGhan")** is a resident of Clark County, Nevada with a history of residing in and doing business in Ventura and Santa Barbara County, California.  McGhan is a founder of Medicor Ltd. (a silicone **breast implant** company) and owned or controlled 42.16% of its stock.  McGhan served as Medicor Ltd.'s Chairman from its inception until resigning on January 24, 2007 because of the facts alleged in this Complaint.  Previously, McGhan was a founder and Director of Medical Device Alliance, Inc. and a founder, chairman and President of Inamed Corporation from 1984 to 1998; McGhan was also a Director of Capital Reef and the control person of various entities used to conceal and launder the funds stolen from the clients of SWX and QES.

///

**CONSOLIDATED CLASS ACTION COMPLAINT**

18. McGhan was identified as the Chairman of the Board of Directors of SWX and was registered with the Nevada Real Estate Division as a 1031 Exchange Accommodator (aka Qualified Intermediary) for SWX before being suspended by the State for the acts alleged herein. McGhan was the President of SWX from July 20, 2006 to October 16, 2006. Other than this brief 3-month period, McGhan was not identified on the corporate records of SWX as an officer of SWX who would or should have signature control over trust funds held on deposit at SWX. Notwithstanding McGhan's lack of written authority to access these funds, McGhan absconded with these trust funds held on deposit at the Banking Defendants, as identified herein.

19. Prior to June of 2004, McGhan had been accused by the Securities Exchange Commission ("SEC") of knowing or recklessly not knowing that his corporation, Inamed Corporation, had made materially false and misleading statements in its financial statements and periodic reports filed with the SEC. Prior to June of 2004, McGhan had also been accused by the Receiver for Medical Device Alliance, Inc. ("MDA") of, among other things, McGhan's participation in a civil conspiracy involving securities fraud in the private placement of MDA stock which included a claim for conversion. When McGhan challenged the role of the receiver in the MDA case, the Nevada Supreme Court stated in no uncertain terms that the "receiver's report confirmed most, if not all, of the Nevada shareholder's allegations of waste, fraud and gross mismanagement committed by McGhan and the other directors." See *Medical Device Alliance v. Ahr*, 116 Nev. 851, 858-59, 8 P.3d 135,140 (2000). Notwithstanding McGhan's defalcations, he was able to make substantial profits for investors in MDA and Inamed. It was McGhan's ability to make money and the mistaken belief that McGhan was "richer than God" which caused the people in this case to set aside their common sense when dealing with McGhan. Public information on the internet and elsewhere made it abundantly clear to anyone who could Google that McGhan was not a proper candidate to serve as a successor trustee of other people's money. Nonetheless, McGhan became the control person at SWX and looted the trust along with P.J. DeMarigny at Smith Barney. McGhan received stolen trust funds in knowing breach of trust and acted for his own personal gain.

CONSOLIDATED CLASS ACTION COMPLAINT

20.     Defendant **Peter John DeMarigny ("DeMarigny")** is a resident of Clark County, Nevada and an investment broker, CRD #2883986.  DeMarigny was employed by Salomon Smith Barney, Inc., now known as Smith Barney, a division of Citigroup Global Markets, Inc. (hereinafter referred to as "Smith Barney") from 1997 to August 2004.  Smith Barney was the financial broker and investment advisor for SWX before and after Capital Reef's purchase of SWX which closed on June 28, 2004.  DeMarigny was SWX's account executive and he was fully aware that the SWX money was trust money before he orchestrated the theft or exchange funds and participated in the theft. DeMarigny was one of the top Financial Advisors (in terms of generating revenue) at Smith Barney's Las Vegas office, and the SWX account at Smith Barney was one of the top accounts at that office.  DeMarigny convinced management at Smith Barney to allow McGhan to loot millions of dollars of SWX's trust assets because McGhan would cause SWX to transfer millions of dollars in investments from SWX's other accounts at Silver State Bank and Merrill Lynch to Smith Barney. Thereafter DeMarigny and McGhan looted the trust money.

21.     DeMarigny left Smith Barney in August 2004 with the SWX account and became an employee of UBS Financial Services, Inc. ("UBS") from August 2004 to some time in February 2005.  For DeMarigny's participation in the conspiracy, he directly, or through family members and controlled entities, knowingly received over $840,000 in stolen trust funds plus the $1,000,000 from UBS which he was forced to return, plus 200,000 shares of Medicor valued at $1,000,000 at the time of his receipt of the shares.

22.     Defendant **James J. McGhan ("McGhan Jr.")** is a resident of Clark County, Nevada with a history of residing and doing business in Santa Barbara County, California. McGhan Jr. is a founder and stockholder of Medicor Ltd. and has served as Director and the Chief Operating Officer from its inception. Previously, McGhan Jr. served as a Director, a Vice President and the Chief Operating Officer of MDA.  McGhan Jr. also served as a Director and Chief Operating Officer of Inamed Corporation from 1996 to 1998. McGhan Jr. is Donald K. McGhan's son who blindly followed his father's instructions. In July of 2006, McGhan Jr. became the defacto manager of SWX after David Keys ("Keys"), its CEO, resigned because of

1 the allegations in this Complaint. McGhan Jr. received stolen trust funds in knowing breach of

2 trust and acted for his own personal gain.

3     23. Defendant **Nikki M. Pomeroy ("Pomeroy")** is the daughter of defendant

4 Donald Kay McGhan who owned at least 4 significant pieces of real property in Clark County,

5 Nevada which were purchased with stolen trust funds.[1] Pomeroy was a Director, employee,

6 agent, representative and secretary of SWX and had access to and control over the trust funds

7 on deposit at SWX, including the funds on deposit at QES. Pomeroy was on the SWX

8 "investment committee" with defendant McGhan and Theodore Robert Maloney which

9 authorized in writing SWX's purchase of bogus notes from related entities to conceal the theft

10 of trust assets. Pomeroy was the secretary of Capital Reef and the sole manager of Blackstone

11 Limited, LLC ("Blackstone") which is 100% owned by Shirley McGhan, Donald McGhan's

12 wife and Pomeroy's mother. Pomeroy is also the manager of Sirius Capital, LLC ("Sirius")

13 which since its inception has never had any employees or provided any services, but received

14 substantial stolen exchange funds. From June 29, 2004 to February 8, 2007 over $75,000,000

15 in SWX and QES stolen trust funds were laundered by Pomeroy through accounts under the

16 control of Peter J. DeMarigny. Pomeroy, as an agent of SWX acted for her own personal gain.

17 Pomeroy received stolen SWX trust property in knowing breach of trust.

18     24. Defendant **Marc S. Sperberg ("Sperberg")**, is a resident of Clark County,

19 Nevada, and was the Vice President of Business Development for Medicor Ltd. Sperberg was

20 appointed Executive Vice President and Secretary of Medicor Ltd. in April 2003. From 1998

21 to 2001, Sperberg was the principal shareholder and executive vice president of sales and

22 marketing for HPL Biomedical (a band-aid manufacturer) which was acquired by Medicor Ltd.

23 in 2001

24     25. Sperberg had a personal relationship with Betty Kincaid (the owner of SWX)

25 prior to June of 2004 and was directed by McGhan to use the confidence created by that

26 relationship to induce Kincaid to meet with McGhan, Theodore R. Maloney, Nikki Pomeroy,

27

28 [1] The 4 properties purchased with stolen trust funds are: 1) 43 Sawgrass Court, Las Vegas, Nevada 89113-1325; 2) 5510 S. Buffalo Drive, Las Vegas, Nevada 89113; 3) Innisbrook Avenue, Las Vegas, Nevada 89113; and 4) 16 Congressional Court, Spring Valley, Nevada 89103-5252

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\W3\7269.001- (SORRELL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

David Keys and Sperberg in Chicago on June 12, 2004 to induce Kincaid to sell SWX to Capital Reef based upon McGhan's false representations to Kincaid regarding his intentions as to SWX. Sperberg invested $100,000 in Capital Reef on June 28, 2004 to help purchase SWX and was repaid $110,000 in stolen trust money on July 6, 2004 (9 days later), which Sperberg knew was stolen from SWX trust funds.

26.    Sperberg is a shareholder in Capital Reef through his entity named MSA Consulting, Inc. Sperberg terminated Alan Finney ("Finney"), an honest executive at SWX, on or about June 16, 2004 and personally escorted Finney to his truck immediately (within 30 minutes) after Finney's termination after more than two years of good work at SWX. Sperberg acted as an agent of SWX from mid-June of 2004 to its closure in late January of 2007. In the summer of 2006, the real estate market started to cool which jeopardized the Ponzi scheme as alleged herein. In response, McGhan directed Sperberg to act as the marketing consultant for SWX whereby Sperberg directed Robert Noggle, the Vice President of Marketing and Education at SWX, to commence an ambitious marketing program to induce more 1031 exchangers to use SWX as their Exchange Accommodator, which included false representations to the public via wire and the U.S. Mail that new exchangers would receive interest on the money deposited with SWX and SWX was now "bonded" with a "$50,000,000 bond" to protect their money on deposit. The "5/50" representations regarding "interest" and the "bond" were false and Sperberg knew they were false.

27.    Sperberg and Theodore R. Maloney created Cennedig, LLC on September 24, 2004 which then ostensibly issued a $4,600,000 term note ten days later to SWX on October 4, 2004. On October 3, 2004, McGhan, Pomeroy, DeMarigny and Maloney flew on the Bombardier Challenger CL-604 jet from Las Vegas to New York and stayed at the Essex House. On October 4, 2004, DeMarigny instructed UBS, in his own handwriting, to transfer $4,600,000 from SWX to Cennedig. The trust money received from SWX was invested by Sperberg in a golf course in Nye County, Nevada. Sperberg received stolen SWX trust property in knowing breach of trust, and/or Sperberg was involved in fraudulent conveyances of SWX trust property which were done with the actual intent to hinder, delay and/or defraud

**CONSOLIDATED CLASS ACTION COMPLAINT**

creditors of SWX.

28.     Defendant **Theodore Robert Maloney ("Maloney")** resides at 22287 Mulholland Hwy #368, Calabasas, California and since September 2003 does business in Clark County, Nevada as a Director and the Chief Executive Officer of defendant Medicor Ltd. Maloney owns substantial chares of Medicor stock. Prior to joining Medicor Ltd., Maloney (California bar #125094) was a partner in the corporate practice group of the law firm of Sheppard, Mullin, Richter & Hampton, LLP from September 2001 to September 2003. Maloney is on the board of directors of defendant Capital Reef, is its President, and a shareholder. Capital Reef received millions of stolen trust funds and Maloney knew it. Maloney is also the managing member of Cennedig Holdings, LLC, a Nevada entity and the 1/3 owner of Cennedig, LLC, a Delaware entity that issued $12,776,000 in bogus notes to SWX in exchange for $12,776,000 in stolen trust assets. Cennedig, LLC is owned and controlled by Maloney, McGhan and Sperberg. Malone was on the "investment committee" for SWX along with McGhan and Pomeroy and he directed SWX in writing to accept the bogus Cennedig, LLC notes in exchange trust assets, some of which was then invested by Cennedig, LLC (Maloney, McGhan and Sperberg) in an 18-hole golf course in Nye County, Nevada. Maloney personally received stolen SWX cash in knowing breach of trust on July 12, 2004 ($206,000), July 16, 2004 ($110,000), and another $200,000 through Medicor Ltd. in July 2004. Maloney invested $100,000 into Capital Reef on June 28, 2004 and received $110,000 back on July 16, 2004 plus Capital Reef stock. The $110,000 payment to Maloney on July 16, 2004 came from SWX stolen trust funds laundered through Blackstone and Maloney knew it.

29.     McGhan, McGhan Jr., Maloney, Sperberg, Pomeroy, DeMarigny, and others own and/or control Capital Reef which was used as the vehicle to acquire SWX on June 28 2004, as well as Nevada National Exchange, ("NNE") in October 2004 and Arrow 1031 Exchange, Inc. ("Arrow") of Boise, Idaho in the summer of 2005. McGhan, McGhan Jr., Sperberg, DeMarigny and Pomeroy formed a conspiracy to steal the clients' assets held in trust at SWX to fund the operations and acquisitions of Medicor Ltd. to increase its stock price for stock they owned or were to subsequently acquire and to purchase a lavish lifestyle beyond the

**CONSOLIDATED CLASS ACTION COMPLAINT**

1   imagination of all of us. DeMarigny joined the criminal enterprise to orchestrate the theft

2   because he was one of two account executives at Smith Barney with confidential information

3   about SWX and Kincaid and he had access to the SWX trust funds.  DeMarigny had a pre-

4   existing relationship with McGhan.  Once successful, these same conspirators used Capital

5   Reef to purchase NNE and Arrow to steal the assets of those Exchange Accommodators.  The

6   theft remained undetected for a significant amount of time because SWX's exchange balances

7   increased dramatically from over $100,000,000 in early 2005 to in excess of $215,000,000 in

8   June of 2005, leaving SWX with sufficient liquidity at Silver State Bank to fund the close of

9   escrows of replacement property with money received from the close of escrows of

10  relinquished property, notwithstanding the fact it was out of trust.  In late 2005, the real estate

11  market cooled which meant that money from the declining number of new exchanges was

12  going to be insufficient to pay for the close of the increasing number of older exchanges,

13  putting SWX in a liquidity crisis by April of 2006.  SWX's liquidity did deteriorate in early

14  2006 (at about the same time McGhan stole $5,375,000 from SWX to lease a 19-passenger jet)

15  and through the remainder of 2006 with no hope in sight.  At the end of the Ponzi scheme,

16  McGhan, McGhan Jr., Pomeroy, Sperberg, and DeMarigny maliciously sought out and

17  purchased QES through Capital Reef on October 20, 2006 and immediately stole its

18  $10,000,000 in trust assets before the scheme collapsed in its entirety in late January 2007 with

19  over $97,000,000 in out-of-pocket losses. McGhan, McGhan Jr., Pomeroy, Sperberg and

20  DeMarigny will be referred to collectively as the "Thief Defendants" or "members of the RICO

21  enterprise".

22       (iii)    **The Banking Defendants**

23       30.    Defendant **Citigroup Global Markets, Inc,** a Delaware corporation, formerly

24  known as Salomon Smith Barney, Inc. **(hereinafter "Smith Barney")** employed DeMarigny

25  as an account executive in Las Vegas from March 1997 to August 2004. In March of 2002,

26  Kincaid hired Alan Finney ("Finney") to work at SWX and Finney interviewed several people

27  from the larger securities broker firms in the Las Vegas area to manage SWX's trust accounts.

28  Finney recommended selecting Smith Barney and SWX did select Smith Barney because it

CONSOLIDATED CLASS ACTION COMPLAINT

agreed to dedicate a team to manage the SWX accounts. One individual on the team was DeMarigny and the other was Bernard Schofield ("Schofield"), who had a prior relationship with Kincaid managing her personal accounts. Defendant Smith Barney knew, based on the knowledge of Financial Advisors Schofield and DeMarigny, as well as the Branch Manager Robbie Barron, that SWX acted as a Qualified Intermediary and held Exchangers' funds in trust pending the completion of the Exchangers' trade into a replacement real property, and that because a tax deferred exchange could be simultaneous, or be as short as one day, it was necessary for SWX to invest the Exchangers' funds in investments which could be liquidated quickly to make funds available to fund Exchangers' replacement escrows.

31. As of June 28, 2004, Smith Barney held $54,699,645 of SWX trust assets in account numbers XXX-05563 and XXX-11164 which were managed by Schofield and DeMarigny. On or about June 28, 2004, Schofield was removed from managing the SWX accounts because of his perceived honesty. Exclusive control was transferred to DeMarigny pursuant to the scheme whereby most of the trust money was then immediately stolen by DeMarigny (while on deposit at Smith Barney while DeMarigny was an employee of Smith Barney). The majority of this money ($37,000,000) was transferred to France in July 2004 for Medicor Ltd to purchase Eurosilicone, the third largest breast implant manufacturer in the world, as part of the scheme to conceal the theft and boost the price of Medicor Ltd. stock which was owned, in part, by the Thief Defendants.

32. Defendant **Silver State Bank** is a Nevada state chartered bank which maintains banking offices in Clark County, Nevada. SWX maintained five accounts with Silver State Bank pursuant to written agreements, account numbers: 35005939 Bus DDA, 35005920 Bus DDA, 35005912 BPM DDA, 35005904 Rep SWP, and 350005890 Bus DDA. Silver State Bank knew that SWX was acting as a Qualified Intermediary pursuant to Internal Revenue Service §1031. SWX's accounts at Silver State Bank did not require written consent by the Exchange clients of SWX prior to withdrawal from those accounts in direct violation of NRS §205.960. SWX was the largest client of Silver State Bank with deposits exceeding $50 million. In 2006, SWX began bouncing checks at Silver State Bank. Thereafter, Silver State

CONSOLIDATED CLASS ACTION COMPLAINT

1 | Bank assisted SWX in transferring funds directly to Capital Reef in knowing breach of trust.

2 | **(iv)   The Non-BFP Transferee Defendants**

3 | 33.   **Defendant Blackstone Limited, LLC ("Blackstone")**, is a Delaware limited

4 | liability company created on February 12, 2004, which is owned and controlled by McGhan.

5 | Blackstone neither provides services for a fee nor manufactures goods to sell.  Blackstone has

6 | no employees other than Pomeroy, who was its "manager" and she is invoking her Fifth

7 | Amendment rights, and it is not the famous Blackstone Equity Group with billions under

8 | management as was represented to David Keys by DeMarigny to conceal the theft.  In or about

9 | June of 2004, Pomeroy opened up an account for Blackstone at UBS in Santa Barbara,

10 | California.  After the June 28, 2004 purchase of SWX by Capital Reef, DeMarigny stole and

11 | transferred by wire across state lines, through the use of federally regulated banks, money from

12 | the SWX Smith Barney account in Las Vegas, Nevada to the Blackstone UBS account in Santa

13 | Barbara, California. On and after July 1, 2004, this money was then immediately wired via

14 | federal fund wire transfer through U.S. Correspondent Bank BNP Paribas in New York to a

15 | Mr. Tourniaires across international boundaries through to France for Medicor Ltd. to close the

16 | purchase Eurosilicone by July 5, 2004.  UBS financial records reveal that from June 29, 2004

17 | through to February 2007, over $75,000,000 in trust money was stolen by the gang of thieves,

18 | wired or transferred through federally regulated banks, deposited into Blackstone's UBS

19 | account (which ultimately came under the control of DeMarigny when he became employed by

20 | UBS) and then withdrawn and consumed by the RICO enterprise, including 3 payments

21 | through Blackstone of $1,750,000 on March 28, 2006, $2,025,000 on April 5, 2006 and

22 | $1,300,000 on July 7, 2006 for McGhan to lease a Bombardier "Global Express" jet which

23 | seats 19 people and cruises at 505 knots.   To conceal the $75,000,000 theft, the Thief

24 | Defendants caused Blackstone to issue a series of bogus corporate notes to SWX which

25 | DeMarigny then falsely represented to David Keys, the President of SWX, that they were

26 | "legitimate" and bonafide "Corporate Mezzanine Term Notes" issued by the famous

27 | Blackstone Equity Fund.

28 | ///

**CONSOLIDATED CLASS ACTION COMPLAINT**

34.     Defendant **Capital Reef Management Corporation ("Capital Reef")**, is a Delaware corporation created on June 15, 2004.  Capital Reef's Directors are identified as defendants McGhan and Maloney.  Capital Reef's Officers are identified as Maloney (the CEO of Medicor Ltd.) and Pomeroy.  Capital Reef uses the same mailing address as Medicor Ltd. and a multitude of other bogus entities associated with the RICO enterprise [2] which is:  4560 S. Decatur Blvd., Las Vegas, Nevada.  Capital Reef was used as the vehicle to purchase SWX and QES and to launder money stolen from the clients of SWX and QES.  DeMarigny was the account executive for Capital Reef while employed at Smith Barney and prepared an enhanced Due Diligence Questionnaire for Capital Reef which contains more false statements than true statements regarding Capital Reef.  One example of money laundering through Capital Reef occurred on October 15, 2004 and October 18, 2004 by DeMarigny as follows:  on October 15, 2004, DeMarigny transferred $3,500,000 in stolen trust money from SWX's account # KVxx3585 at UBS to Capital Reef's account #KVxx3690 at UBS.  Both accounts were under DeMarigny's control.   Then two days later, on October 18, 2004, DeMarigny transferred $2,500,000 from Capital Reef's account #KVxx3690 at UBS to the account of Trinity Star at UBS account #KVxx3689 and another $1,000,000 from Capital Reef's account #KVxx3690 to Trinity Star's account #KVxx3639 on December 6, 2004.   Trinity Star is another McGhan entity and DeMarigny controlled its accounts at UBS. This $3,500,000 was then dissipated through Trinity Star.

35.     **Global Aviation Delaware, LLC ("Global Aviation")**, is a Delaware Limited Liability Company created on September 29, 2003.  Global Aviation is controlled by McGhan and leased two jets for McGhan's use. Over $15 million of SWX trust money was spent on McGhan's private jet travel.  McGhan used these private jets to induce people to depart with their common sense. The first jet was a Bombardier Challenger, model CL-604, serial number 5304, engine serial numbers GE-E 872011 and GE-E 872012, Federal Aviation Administration ("FAA") registration number N604VM. The cost to charter this jet would be approximately

---

[2]  Other bogus McGhan-related entities used in the RICO scam include:  Sirius Capital, LLC; Cennedig, LLC; NexGen Management, LLC; Trinity Star Ventures, LLC; Ventana Coast, LLC; and McGhan Ranch, LLC.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\WK707269.001\_(SORRELL)\W7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

$4,500 per hour. The second jet was a Global Express Bombardier Challenger, Model BD-700, serial number 9018, engine serial numbers Rolls Royce 12137 and Rolls Royce 12138, FAA #N818TS. The cost to charter this jet was $8,500 per hour and the purchase price could be between $30 to $45 million. This jet, when compared to other private jets, is beyond impressive.

36.    Over $15,000,000 in stolen SWX trust property was used to operate the leased jets.  Examples of transfers of stolen trust property to Global Aviation include:  (i) a June 30, 2004 wire transfer of $584,000.00 from Blackstone's UBS account controlled by Pomeroy through Bank of New York to the credit of Global Aviation's account at U.S. Bank, account number xx5759.  This was part of the same stolen $5,000,000 and $24,000,000 in trust money that was transferred by DeMarigny out of the SWX Smith Barney Account number xx5563 on June 29, 2004 and June 30, 2004 and immediately wired to the Blackstone UBS account number VBxx8414 on the same respective days; (ii) an August 6, 2004 wire transfer of $2,000,000 from Ventana Coast's account controlled by Pomeroy though Citibank to the credit of Global Aviation's account number xx5759 at U.S. Bank.  This money originally came from money stolen out of the SWX accounts controlled by DeMarigny in exchange for bogus Ventana Coast notes issued to SWX as further alleged.  The $2,000,000 was used by McGhan for, among other things, personal expenses including an October 8, 2004 wire of $215,000 to Bombardier, Inc. and debt payments to GE Capital to pay for the Challenger jet.

37.    **International Integrated Industries, LLC ("I.I.I.")**, is a Nevada limited liability company created on November 18, 1996, which is owned and controlled by McGhan. I.I.I. has ostensibly acted on an ongoing basis on behalf of Medicor Ltd. by funding this publicly traded company's expenses for which Medicor Ltd. has a revolving loan agreement with I.I.I.  All of the money advanced to Medicor Ltd. by I.I.I. from July 1, 2004 to late January 2007 was actually stolen SWX trust money which was transferred first to Blackstone, then to I.I.I., and then to Medicor Ltd. to conceal the source of the stolen money.  In order to increase the price of Medicor Ltd. stock owned by the Thief Defendants, they caused Medicor Ltd. to file false financial statements with the SEC and disseminated false information to the public making false representations that the money loaned to Medicor Ltd. by I.I.I. was I.I.I.'s

**CONSOLIDATED CLASS ACTION COMPLAINT**

money.   For instance, during Medicor Ltd.'s fiscal year ending June 30, 2004, the Thief Defendants falsely represented to the SEC and the public that I.I.I. had advanced $32,957,100 to Medicor Ltd.; for Medicor Ltd.'s fiscal year ending June 30, 2005, they represented that I.I.I. had advanced $22,090,000 to Medicor Ltd. of which $5,872,912 was repaid to I.I.I.; and for Medicor Ltd.'s fiscal year ending June 30, 2006, they represented that I.I.I. had advanced $10,630,000 to Medicor Ltd. of which $477,231 was repaid to I.I.I.   On April 26, 2006, Medicor Ltd. issued a promissory note to I.I.I. for $31,039,000 and another note to Sirius Capital, LLC for $37,500,000 which ostensibly represented the advances made by I.I.I. but which actually represented, for the most part, Medicor Ltd.'s receipt of stolen trust money. McGhan used the money he stole from the clients of SWX to fund Medicor Ltd.'s ongoing expenses through the use of I.I.I. as a device to launder the money for his own personal gain and to inflate the stock price of Medicor Ltd. as the 42.16% controlling shareholder of Medicor Ltd.   I.I.I.'s receipt of stolen funds was a knowing breach of trust.

38.   **Medicor Ltd., a Delaware corporation ("Medicor Ltd.")**, is a company that develops, manufactures and markets medical devices, including breast implants. Medicor Ltd. is based at 4560 S. Decatur Blvd., Las Vegas, Nevada and had an office in Santa Barbara, California.   Medicor Ltd. is a publicly traded company and at one time had over 400 employees.   Medicor Ltd.'s executives include defendant McGhan (former Chairman and Director, resigned January 24, 2007 when his scam discussed in this Complaint became known), Maloney (CEO and President), defendant McGhan Jr. (co-founder and Chief Operating Officer) and Sperberg (Vice President and Secretary).   Funds received by Medicor Ltd. which are represented to have come from I.I.I. are SWX trust funds which Medicor Ltd. received in knowing breach of trust.   After July 1, 2004, Medicor Ltd.'s stock price was artificially inflated by the securities fraud committed by the Thief Defendants as further alleged.   The Thief Defendants adversely dominated Medicor, using Medicor as a device to conceal the theft of SWX trust funds.   Medicor did not direct McGhan to steal trust assets. Rather, the thief defendants used Medicor for their own personal gain and their actions were adverse to Medicor.   Medicor is in bankruptcy which precludes it from being named as a

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTERWORK\17269-001, (SOBBEL)\17269-007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1  defendant in this action.

2        **(v)    The Negligent Members of the Medicor Board of Directors**

3        39.    Defendant **Mark Brown ("Brown")** is a resident of Clark County, Nevada.

4  Brown became a director of Medicor on February 7, 2003.  Prior thereto, Brown attempted to

5  assist McGhan in taking control over MDA from George Swartz, the Court Appointed Receiver

6  of MDA.  Brown was aware of the allegations against McGhan of looting MDS for the benefit

7  of Inamed.  Brown was aware that McGhan had in the past illegally used funds from one

8  controlled entity to benefit another controlled entity in order to make money for McGhan and

9  his investors (including Brown).

10        40.    In October of 2004, in compliance with the Sarbanes-Oxley Act of 2002,

11  Medicor established an audit committee of its board of directors. Pursuant to the Sarbanes-

12  Oxley Act, the members of the audit committee were to be "independent" as defined in the Act.

13  The purpose of the audit committee was, inter alia, to monitor the financial transactions

14  between Medicor and McGhan and McGhan related entities. Defendant Brown was appointed

15  as a member of the audit committee on October 22, 2004.

16        41.    Defendant **Thomas Hartley ("Hartley")** is a resident of Clark County, Nevada.

17  Hartley became a director of Medicor in October of 2004, and was appointed as the chairman

18  of the audit committee.  Prior thereto, Hartley attempted to assist McGhan in taking control

19  over MDA from George Swartz, the Court Appointed Receiver of MDA.  Hartley was aware of

20  the allegations against McGhan of looting MDA for the benefit of Inamed.  Hartley was aware

21  that McGhan had in the past illegally used funds from one controlled entity to benefit another

22  controlled entity in order to make money for McGhan and his investors (including Brown).

23        42.    Hartley and Brown will sometimes be referred to as the "Negligent Medicor

24  Board Defendants."  Hartley and Brown approved of the April 2006 $50,000,000 loan from

25  Silver Oak Capital ("Silver Oak") to Medicor which required the pledge of security from

26  Medicor to Silver Oak.   The pledge of security to Silver Oak included an interest in

27  Eurosilicone SA, an asset of Medicor's which was purchased with stolen SWX trust money.

28  As a result of the Silver Oak transaction approved by Hartley and Brown, the Sorrell plaintiffs

**CONSOLIDATED CLASS ACTION COMPLAINT**

have been damaged by Silver Oaks' contention it is a bona fide purchases for value taking title to the interest in Eurosilicone S.A. superior to the Sorrel Plaintiffs' rights to trace stolen trust assets into Eurosilicone S.A.

**(vi)   The Negligent SWX Employee Defendant**

43.   Defendant Betty A. Kincaid ("Kincaid") is a resident of Clark County, Nevada and at times relevant to this case was an employee, representative and agent of SWX exercising control over the trust funds held on deposit at SWX.  Kincaid founded SWX in 1990 and by 2000 it had grown, through her hard efforts, into the largest Exchange Accommodator in all of Nevada.   SWX had great success under Kincaid's leadership notwithstanding the fact that SWX, as a general business practice, was committing a category D felony in Nevada by commingling the trust money and withdrawing trust money out of Silver State Bank without written client approval in violation of NRS §205.960.  On or about June 24, 2004, without proper due diligence, Kincaid sold her interest in SWX for $3,000,000 to Capital Reef which was controlled by McGhan and other members of the RICO enterprise and was paid by the wire transfer of $3,000,000 on June 28, 2004 into the Betty Kincaid Family Trust account number xxx11191 at Smith Barney.   Pursuant to this transaction, Kincaid retained a 25% interest in Capital Reef and remained as an employee and agent of SWX until July 1, 2006, when (after commencing litigation against McGhan and others) she sold her remaining 25% interest in Capital Reef (which had no assets and only liability) to McGhan for his commitment of another $3,000,000 pursuant to a promissory note executed by McGhan on August 24, 2006 (plus a $275,000 per year consulting agreement) in exchange for her acquiescence to the perceived crimes committed as alleged herein.  Pursuant to the promissory note, McGhan paid Kincaid $1,000,000 on September 18, 2006, another $500,000 on October 5, 2006, another $500,000 by November 3, 2006 and another $500,000 by December 3, 2006 (for a total of $2,500,000), all with money stolen out of SWX's trust account.  Prior to the June 24, 2004 sale of SWX to Capital Reef, the SWX trust account had a deficit of $1,546,913 and Kincaid had also borrowed $3,469,637 in trust assets to purchase real estate in Hawaii.  The documents evidencing the sale of SWX to Capital Reef and SWX's general ledger reflect that all parties

F:\MATTER\WCX\7269.001- (SORREL)\7269.007 Transferred Litigation USDC New Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

involved were aware and acknowledged in writing that the assets of SWX were trust funds held by SWX for the benefit of others. The duties of a trustee include protecting the trust res, strict compliance with the trust documents, impartiality, full disclosure, prudent investment and due diligence in the selection of a successor trustee. Kincaid received stolen trust funds in knowing breach of trust and acted for her own personal gain.

**(vii)     The Negligent QES Employee Defendants**

44.     Defendant Kyleen M. Dawson (**"Dawson"**) is a resident of Santa Barbara County, California and at times relevant to this case was an officer, agent, representative and employee of QES exercising control over the trust funds on deposit at QES which were held by QES as trustee for its clients as beneficiaries of each respective trust created by each client for the purpose of accomplishing a 1031 exchange. On October 20, 2006, Dawson sold her interest in QES to Capital Reef without proper due diligence (and was paid with stolen trust funds) whereafter the QES assets held in trust were transferred to SWX's control and immediately looted by McGhan and the other members of the RICO enterprise. Dawson received stolen trust funds in knowing breach of trust and acted for her own personal gain.

45.     Defendant Megan L. Amsler ("**Amsler"**) is a resident of Santa Barbara County, California and at times relevant to this case was an officer, agent, representative and employee of QES. On October 20, 2006, Amsler sold her interest in QES to Capital Reef without proper due diligence (and were paid with stolen trust funds) whereafter the QES assets held in trust were immediately looted by McGhan and the other members of the RICO enterprise. Amsler received stolen trust assets in knowing breach of trust and acted for her own personal gain.

# IV.

# AGENCY AND CONSPIRACY

# ALLEGATIONS

46.     Plaintiffs allege that the acts and events alleged against each Thief Defendant were in collaboration, collusion, and conspiracy with each other Thief Defendant and each such Defendant authorized or ratified the acts of each other in furtherance of the scheme to steal the money and knowingly breach the trust.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTERS\MK7269.001\[SORRELL]\7269.007 Transferred Litigation USDC New  Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

47.     Plaintiffs allege that DeMarigny was an employee of Smith Barney from 1997 through to August of 2004 and his acts as the account executive for SWX were performed within the course and scope of his employment with Smith Barney as the securities broker and investment advisor for SWX and the other McGhan entities.  Bernard Schofield, an employee of Smith Barney, also served as a Financial Advisor to Southwest Exchange until June 28, 2004.   Smith Barney possessed the collective knowledge of Schofield, DeMarigny, Tom Gilman, Robbie Barron, Tanya Escobedo and its other employees related to SWX business affairs as an exchange accommodator holding the exchangers funds as trust assets.   The conduct of DeMarigny, Schofield, Gilman, Escobedo and other Smith Barney employees as alleged herein occurred substantially within the time and space limits and the course and scope authorized by their employment, was motivated in part by a purpose to serve their employer, was of a kind that they were hired to perform, was in part beneficial to their employer, and was ratified and affirmed while they were employed and after some of their departures by Smith Barney's silence, hiding documents, non-disclosures and acceptance of income from SWX and the other RICO enterprise entities in the form of fees, interest and/or commissions paid to Smith Barney.  DeMarigny conspired with the other Thief Defendants while employed at Smith Barney which means that by operation of law Smith Barney conspired as alleged herein.

## V.

## INFORMATION ALLEGATIONS

48.     Allegations made in this Complaint have been based on information and belief, except those allegations that pertain directly to Plaintiffs, which are based on their personal knowledge.   Plaintiffs' information and belief is based on, *inter alia*, the investigation conducted by Plaintiffs and Plaintiffs' attorneys after their retention.  Each and every allegation and factual contention contained in this Complaint has evidentiary support or, alternatively, is likely to have evidentiary support after reasonable opportunity for further investigation or discovery by Plaintiffs or their counsel.

///

///

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\WK317269.001- (SORRELL)\17269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

# VI.

## THE BUSINESS OF 1031 EXCHANGES

49.    The business of 1031 exchanges refers to the IRS code section that allows for like kind transfers of property that defer capital gains tax as graphically depicted below:

### 1031 EXCHANGE



50.    IRS Code §1031 prohibits the seller of property from taking possession of the proceeds at any time during the 1031 transaction.   Thus, Exchange Accommodators (also called "Qualified Intermediaries") were established in order to take possession and hold the funds in trust, while substitute property was designated by the client, and then transfer those funds directly to the escrow established to complete the purchase of the Replacement Property or properties.

51.    1031 exchanges are most commonly used with real estate transactions.   The deferral of capital gains is the incentive for property owners to utilize tax deferred exchanges. As a result, Exchange Accommodators often handle large sums of money that they hold in trust for periods of up to 180 days.  Exchange Accommodators are largely unregulated, unlike banks and insurance companies which also provide this same service.  Exchange Accommodators charge a fee in order to hold the funds in trust and to accommodate their clients' exchange. Generally, the fee includes the interest earned on the funds held in trust which are to be

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTER\M317269-001-\SORRELL\17269-007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

invested in safe fiduciary accounts.  The trust accounts are required to be separated from the operating funds of the intermediaries and in Nevada client consent is needed to withdraw the funds.  Because, generally, the clients of the Exchange Accommodators do not receive the interest on the funds invested, they do not receive an accounting of their investment at the close of escrow of their replacement property.  This lack of an accounting process creates the perfect scenario for the theft of these funds by unscrupulous fiduciaries and thieves working in collusion with them.

52.     Although the legal title to the funds of the clients of the Exchange Accommodators was transferred to the intermediaries, the clients retained all rights in the proceeds of the transaction except for the use and benefit of the money during the exchange period.  The proceeds are held in trust by the intermediary acting in the capacity of a trustee for the client (the beneficiary of the trust).

## VII.

## GENERAL FACTUAL ALLEGATIONS ABOUT THE
## EXCHANGE ACCOMMODATOR DEFENDANTS

53.     Plaintiffs owned investment real property which was sold and the proceeds of which were transferred to the Exchange Accommodator Defendants pursuant to the terms of Exchange Agreements entered into with each client.  Each Exchange Agreement was mailed in the U.S. mail to each client and it contained the representation that each client's funds would be deposited into an FDIC insured account and retained and used exclusively for the client's subsequent purchase of replacement property.  Thereafter, Plaintiffs entered into contracts to purchase like kind replacement property and deposited earnest money in escrow to purchase the replacement property by the 180 day requirement for a 1031 exchange.

54.     In or about late January 2007, Plaintiffs were informed that their money held in trust was no longer available.  As a result of the loss of the access to these funds, the Plaintiffs may also: (i) lose their tax deferred status and be subjected to a capital gains tax on the profits from the sale of the relinquished property without access to the stolen funds to pay the tax; (ii) be in breach of contracts to purchase replacement property and be subjected to damages

1  including the loss of their deposit unless they come up with alternative funds to close escrow;

2  (iii) be required to hire attorneys to attempt to recover their funds and defend actions, if any,

3  brought by the seller of the replacement property and tax advisors to deal with the IRS; and (iv)

4  have to share in the cost associated with the retention of a successor trustee hired to administer

5  the trust.  Similar consequential damages are currently being suffered by each member of the

6  class.

7    55. Since late January 2007, Plaintiffs have been advised that: (i) QES is out of

8  business; (ii) SWX has closed its doors; (iii) Medicor Ltd.'s doors are locked, its web-site is

9  down and its stock no longer trades, and it has filed for bankruptcy protection in Delaware; (iv)

10  a receiver for SWX has been appointed; (v) McGhan resigned from Medicor Ltd. and the

11  Nevada Department of Real Estate revoked his license as an Qualified Intermediary; (vi)

12  lawsuits have been filed against QES and SWX; and (vii) there is over $97,000,000 in trust

13  funds owned by 133 clients that have been stolen by employees of SWX acting in collusion

14  with others.

15  **VIII.**

16  **ALLEGATIONS REGARDING THE CONSPIRACY**

17  **TO STEAL THE TRUST FUNDS OF THE CLIENTS OF**

18  **THE EXCHANGE ACCOMMODATORS**

19  **FACTUAL BACKGROUND**

20    56. The Nevada legislature passed N.R.S. § 205.90 in 1993 in order to "protect the

21  public from unscrupulous intermediaries who handle certain real estate transactions."  The

22  proponents of the legislation noted that "there were few controls over such intermediaries and

23  problems had arisen as a result of intermediaries absconding with funds or becoming

24  insolvent."  As a result, in order to prevent the theft of exchange client money, the Nevada

25  legislature made it a category D felony for a qualified intermediary to withdraw exchange

26  client money from an account without the express written consent of its exchanger client. *See*

27  N.R.S. § 205.90(1)(c).  The Plaintiffs in this case represent the very people that the Nevada

28  legislature intended to protect.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTERS\WK\17269.001- (SORREL)\17269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

///

## SOUTHWEST EXCHANGE, A "QUALIFIED INTERMEDIARY"

57.     Southwest Exchange held itself out to the public as a qualified intermediary under IRS Code Section 1031 from its creation through its demise in January, 2007.  In 1991, Betty Kincaid ("Kincaid") formed Southwest Exchange to hold the funds of those persons seeking to complete a tax deferred exchange of real property under IRS Code Section 1031. Pursuant to the Exchange Agreement with its clients, Southwest agreed to hold the funds from the sale of a client's relinquished property ("Relinquished Property") pending the completion of a tax deferred exchange and purchase of a replacement property ("Replacement Property"). The funds deposited by the client were designated for the express purpose of completing a tax deferred exchange.[3]  The clients entrusted their funds with Southwest, and in exchange for a fee, Southwest agreed to hold those funds in trust until the completion of the 1031 exchange. At all relevant times, Southwest was subject to the provisions of N.R.S. § 205.90.

## THE CREATION OF A TRUST RELATIONSHIP

58.     Southwest advertised and touted its "*Excellence, Integrity, Education*" to the general public.  Both in perception and in reality Southwest held its clients' funds in trust.  The internal documentation and accounting records at Southwest designated the client funds as "trust" funds, and the clients were informed that their funds would be used to complete their designated 1031 exchange. Indeed, Barbara Seitz (the CFO for Southwest and Kincaid's sister) testified that everyone within the company referred to the client funds as funds held in a "trust account" for the benefit of the clients.  Even PJ DeMarigny, a co-conspirator in this fraud, unequivocally classified the funds on deposit with Smith Barney as "trust funds" in a report he prepared for Southwest on Smith Barney letterhead.[4]  DeMarigny described the client money on deposit at Smith Barney as "trust assets," and set forth the express objective to "manage

---

[3]   The Exchange Agreement for Southwest Exchange stated that Southwest would use "the funds" deposited by the exchanger to close the purchase of the Replacement Property.

[4]   Southwest's Investment Policy Statement, at page 4, identified the goal "to provide net interest margins using investments to maximize spread over cost of capital of the *trust account* of 1031 exchange funds..."

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\W\317269.001- (SORREL)\17269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12.23.08.doc

1    trust assets according to prudent standards established in common trust law." The relationship

2    between Southwest and its clients was nothing more and nothing less than a fiduciary

3    relationship. Unfortunately, neither DeMarigny, nor Smith Barney would treat the funds as

4    money held in trust for the clients of Southwest, even though they knew Southwest was a

5    qualified intermediary holding exchange funds for its clients.

6    ### SOUTHWEST INVESTS CLIENT MONEY WITH SMITH BARNEY

7    59.    By approximately 2002, the client funds deposited in trust with Southwest had

8    grown significantly at Silver State Bank ("SSB"), its depository institution. As a result,

9    Kincaid hired an individual named Alan Finney ("Finney") to manage the client money, since

10   Finney had a background in banking. Finney proposed that Kincaid run Southwest more like a

11   small bank than a title company by investing client funds in order to earn returns on the funds.

12   Ultimately, Kincaid and Finney decided to commingle client funds into an omnibus account

13   and invest a portion of the client money in "liquid and safe" securities in order to make money

14   on the spread between the interest earned and the interest paid to the client. Accordingly,

15   Southwest designated a portion of client funds for investment and began to "shop" local

16   securities firms to assist with the investment of the client funds.

17   60.    Kincaid had a previous business relationship with Bernard Schofield

18   ("Schofield"), a financial consultant with the Las Vegas office of Smith Barney. Kincaid and

19   Finney approached Schofield to take on Southwest as a client. Ultimately, Smith Barney won

20   the business of Southwest and Kincaid transferred approximately $40 Million of the client

21   funds held at SSB into the commingled, omnibus investment account opened by Schofield at

22   Smith Barney. Initially, Schofield managed the omnibus account on his own despite a clear

23   policy at Smith Barney prohibiting the use of omnibus accounts.[5]

24   61.    Eventually, Schofield added DeMarigny as a financial consultant to the

25   Southwest account based upon DeMarigny's purported expertise in money management. As a

26   general rule, Finney, Seitz and Teresa Story-Turner (an exchange specialist from Southwest)

27   _____

28   [5] Smith Barney's "Compliance Desk Top Reference Manual (April, 2004)" at ¶2.3F identifies "Unacceptable
     Accounts," including "Omnibus accounts."

**CONSOLIDATED CLASS ACTION COMPLAINT**

interfaced with Schofield and DeMarigny regarding the investment of Southwest client funds. Through this process, Finney, Schofield and DeMarigny ultimately became personal friends. Schofield and DeMarigny would propose investment opportunities to Finney, who would then submit those opportunities to Kincaid for approval.  Kincaid made it clear that she had the ultimate decision making authority regarding the investment of exchange client money and that no investments were made without her prior approval.[6]  Schofield discussed this protocol with DeMarigny and Robert Barron (Smith Barney branch manager), and reinforced the protocol with Barron and Tanya Escobedo (Smith Barney operations manager).[7]

62.     As part of the ongoing business relationship between Southwest and Smith Barney, Finney discussed the business model of Southwest at length with Schofield and DeMarigny. Finney informed the financial consultants at Smith Barney that, due to the 1031 rules and regulations, Southwest had an obligation to fund existing exchanges on a rolling basis and therefore needed investments that were "100 percent liquid."[8]  Finney also made it clear that "this was other people's money" and that any investment of client funds had to be made in low risk securities in order to protect the client funds.[9]

> **A:**     And everybody on the team knew, including the consultants that we brought in at CitiGroup, that you had to have 100 percent liquidity period, no ifs ands or buts.[10]
>
> **Q:**     Fair to say that you stressed the importance of liquid and safe investment?
>
> **A:**     Stressed to the point that there's absolutely no question in this entire planet that P.J. and Bernie understood that this money must be 100 percent principal-protected.[11]

---

[6]  As discussed in further detail hereinafter, a breach in this chain of authority by DeMarigny would serve as the first in a long line of red flags ignored by Smith Barney.

[7]  Deposition of Bernard Schofield at p. 185, 186, 220.

[8]  Deposition of Alan Finney at p. 21, lines 20-25.

[9]  Id. at p. 27, lines 4-15.

[10]  Id. at p. 22, lines 3-6.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTERS\W3\7269-001- (SORRELL)\7269-007 Transferred Litigation USDC Nev, Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1    **A:**    It was very – very, very clear that this was other people's money that – we

2    were holding onto in the form of a 1031 exchange.[12]

3    **A:**    So Bernie and P.J. were charged with absolutely knowing everything that

4    there is to know about the business, inside and out.    There was not one

5    thing about the business that they were not confided with.[13]

6    63.    The testimony of Alan Finney does not stand alone with respect to Smith

7    Barney's knowledge.    Bernard Schofield testified that he knew the money on account at Smith

8    Barney was client money,[14] and that Southwest required "safety, liquidity and enhanced

9    returns."[15]    Smith Barney manager Robert Barron also knew the Southwest account contained

10    other people's money.[16]

11    64.    Ultimately, Finney built a relationship of trust with DeMarigny and provided

12    Smith Barney with monthly reports indicating the financial obligations of Southwest on an

13    ongoing basis.[17]    Finney was very candid with DeMarigny regarding the business of Southwest,

14    stating "P.J. knew 100 percent of everything regarding Southwest Exchange's internal

15    operation.    There was not one detail of our operation that was left out from P.J."[18]    DeMarigny

16    would ultimately capitalize on that knowledge and betray both Finney and his client Southwest

17    Exchange.

18    ///

19

20
_____

[11]    Id. at p. 28, lines 13-18.

21    [12]    Id. at p. 27, lines 12-15.

22    [13]    Id. at p. 24, line 25 – p. 25, line 4.

23    [14]    Deposition of Bernard Schofield at p. 60, 71, 135, lines 13 – 21.

24    [15]    Id. at p. 86, line 16.

25    [16]    Deposition of Robert Barron at p. 37.    Despite the fact that Southwest held other people's money, Barron

26    testified that he did not believe the Southwest account was any different than any other client account at Smith
Barney. Id. at p. 38.

27    [17]    Deposition of Alan Finney at p. 374, line 19 – p. 375, line 3.

28    [18]    Id. at p. 35, lines 14-17.

CONSOLIDATED CLASS ACTION COMPLAINT

1  ///

## SOUTHWEST BECOMES ONE OF THE LARGEST SMITH BARNEY CLIENTS

65.     By early 2004, Southwest had in excess of $100 Million of client money under management and had invested approximately $40 Million of that money in the commingled investment account at Smith Barney.  Southwest became one of the largest and most valued clients of the Las Vegas office of Smith Barney.[19]  While Southwest earned interest on the investment of client funds, Smith Barney earned significant fees and commissions.  Indeed, Schofield and DeMarigny jointly managed the Southwest account and earned fees exceeding $500,000 in 2003.[20]

66.     Although the business was performing well, Kincaid expressed her desire to get out of the day-to-day operations of Southwest, the company she had run since 1991.  Kincaid had been named the President of the Women's Council of Realtors (WCR), which she anticipated would take up the majority of her time.  As a result, Kincaid proposed to sell a large share of the company to her employees as part of an Employee Stock Ownership Plan (ESOP).  Finney, Seitz and Story-Turner negotiated with Kincaid to buy out a majority of her interest in the company (eighty percent) for $3 Million.[21]  As part of the negotiations, Finney shared information with Schofield and DeMarigny regarding the ESOP.[22]

67.     According to Finney, "P.J. knew everything about the ESOP."[23]  In fact, DeMarigny knew the amount of money Kincaid was willing to accept as payment for her interest in Southwest.[24]  DeMarigny's co-workers Tom Gilman and Bernard Schofield corroborated Finney's testimony regarding DeMarigny's knowledge.  Gilman stated that

---

[19]  Deposition of Robert Barron at p. 34.

[20]  Schofield Letter at SMB0000589

[21]  Deposition of Alan Finney at p. 80, lines 10-13.

[22]  Id. at p. 77, lines 2-3.

[23]  Id. at p. 76, line 25.

[24]  Id. at p. 85, lines 10-12.

CONSOLIDATED CLASS ACTION COMPLAINT

1    ". . . Finney was trying to put together an ESOP to try to buy the business from Betty. I know

2    P.J. was tied up in discussions with Alan Finney."[25] Schofield confirmed that DeMarigny

3    participated in the ESOP discussions.[26] DeMarigny would later use confidential information

4    regarding the $3 Million purchase price of Southwest (which he learned through his

5    employment with Smith Barney) in his plot with McGhan to fleece Southwest.

6                    SOUTHWEST BECOMES A PRIME TARGET FOR A PONZI SCHEME

7            68.    As the Plaintiffs in this case would become painfully aware, the commingled

8    nature of the Southwest account at Smith Barney (in combination with the 45 to 180 day

9    holding period for client money created by the 1031 rules and regulations) created a prime

10   target for a Ponzi scheme. So long as sufficient new exchange funds came into Southwest, a

11   dishonest group of individuals could divert funds from the commingled account at Smith

12   Barney without detection, and then pay existing exchange obligations with new money during

13   the 45 to 180 day exchange period to hide their theft of funds. The only missing ingredients

14   were a dishonest individual willing to misappropriate exchange funds, and an insider at Smith

15   Barney willing to divulge confidential information and assist with the looting of exchange

16   funds. McGhan and DeMarigny filled there roles.

17                           THE MCGHAN – DEMARIGNY CONNECTION

18           69.    Don McGhan was a successful entrepreneur and businessman by any measure.

19   McGhan was the lead engineer involved in the creation of the first silicone breast implant at

20   Dow Corning,[27] and he subsequently built and sold numerous medical device businesses over

21   the years, including the highly successful company Inamed.[28] McGhan flew to business

22   meetings in his own, personal "Global Express" jet – a nineteen passenger luxury airliner. He

23

24   _____

25   [25]  Deposition of Tom Gilman at p. 15, lines 14-17.

     [26]  Deposition of Bernard Schofield at p. 368, lines 10-15.
26
     [27]  Deposition of Don McGhan at p. 15, lines 9-21.
27
     [28]  Deposition of Don McGhan at p. 15 – 27, discussing involvement with Dow Corning, Heyer-Shulte, McGhan
28   Medical Corporation (sold to 3M), McGhan Nusil Corporation (sold to Union Carbide), Immulok (sold to Johnson
     &Johnson), Inamed Corporation, Medical Device Alliance (MDA) and Medicor, Ltd.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTER\MK3\7269-001- (SORRELL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

traveled the world and lived an opulent lifestyle. In fact, it was a popular belief that McGhan had amassed a personal fortune well in excess of $100 Million.[29] To the outside world, including DeMarigny, McGhan was a major player and a potentially lucrative client for DeMarigny and Smith Barney. In reality, Don McGhan was quickly going broke.

70. By 2004, McGhan had leveraged his fortune into his latest business venture called Medicor, and Medicor was struggling to make its name in the medical device business. Don McGhan started Medicor in 2000 with the stated business goal of making Medicor one of the largest breast implant manufacturers in the world. He located his newest medical device business in Las Vegas, Nevada.

71. McGhan believed that Medicor would compete on a level with Inamed and Mentor, the largest breast implant manufacturers in the world, and companies he had shaped. However, Medicor never sold a breast implant within the United States and struggled with FDA restrictions on its products.[30] Medicor was losing $5 Million per year.[31] As a result, McGhan and Medicor began targeting foreign acquisitions with existing breast implant sales in Europe and South America in order to tap into an existing source of income. One potential acquisition target was Eurosilicone, S.A. in France.

72. By coincidence, Smith Barney's Las Vegas office was located in the same building as another company owned by McGhan called International Integrated Industries ("III"). DeMarigny met Don McGhan by walking into the offices of III and soliciting McGhan's business.[32] DeMarigny aggressively courted McGhan's business, promising that Smith Barney would assist McGhan in raising capital for Medicor. According to Schofield, "Mr. McGhan was an individual that P.J. had been prospecting at some point earlier."[33]

---

[29] Deposition of Ted Maloney at p. 642, lines 11 – 13.

[30] This fact is supported by Medicor SEC filings.

[31] Deposition of Ted Maloney at p. 115.

[32] Deposition of Don McGhan at p. 90, lines 4-18.

[33] Deposition of Bernard Schofield at p. 194, lines 19-20.

CONSOLIDATED CLASS ACTION COMPLAINT

DeMarigny informed Schofield that "Don had a concentrated stock position, and that if P.J. were able to establish a lending situation for him at Smith Barney, that Don would bring his account to Smith Barney."[34]    Ultimately, Smith Barney would not loan money against McGhan's restricted stock holdings,[35] and DeMarigny complained bitterly to Schofield that Smith Barney wouldn't help Don McGhan with his lending need.[36]  DeMarigny was chasing McGhan as a Smith Barney client.

73.    DeMarigny continued to follow McGhan's businesses and monitored the business interests of Medicor so closely that DeMarigny knew the exact dollar amount of financing necessary to purchase Eurosilicone.[37]  Ultimately, through little more than sheer persistence, DeMarigny won a small portion of McGhan's business.[38]  DeMarigny continued to make promises to McGhan regarding his ability to raise money through Smith Barney. However, DeMarigny was never really successful in his efforts to raise money through legitimate channels.  There is little doubt that DeMarigny wanted all of McGhan's financial business and needed to prove his worth to McGhan.[39]  As a result, DeMarigny began using his knowledge, access to information and employment with Smith Barney to raise capital for McGhan by any means necessary.

## DEMARIGNY ASSISTS MEDICOR TO RAISE CAPITAL ON THE PRIVATE MARKET

74.    By 2003, Medicor was soliciting the investment of private money through convertible debentures paying 8% interest.  DeMarigny officiously volunteered to solicit his

---

[34] Id. at p. 201, lines 1-5.

[35] Deposition of Don McGhan at p. 97, lines 4-7.

[36] Deposition of Bernard Schofield at p. 201, line 23 – p. 202, line 1.

[37] Deposition of Don McGhan at p. 105, line 4-8.

[38] Deposition of Don McGhan at p. 96, lines 13-19.

[39] The majority of McGhan's financial holdings were held at Wedbush Morgan securities.  According to McGhan, Wedbush would loan money against McGhan's restricted stock holdings at terms that no other firm could match. DeMarigny wanted Smith Barney to replace Wedbush as McGhan's brokerage house. See, Deposition of Don McGhan at p. 96.

CONSOLIDATED CLASS ACTION COMPLAINT

E:\MATTERS\K317269.001- (SORRELL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

clients at Smith Barney to make investments in the Medicor convertible debentures.[40] Ultimately, DeMarigny and a co-worker named Tom Gilman convinced at least one of their clients (an elderly gentleman named Clay Rogers) to invest millions of his personal assets in Medicor.[41]  For their efforts, DeMarigny and Tom Gilman each received a $50,000 kickback from Medicor.

75.    In an effort to raise additional capital for McGhan, DeMarigny introduced Don McGhan to his friend Alan Finney to discuss the prospect of Southwest investing client funds into Medicor.[42]  DeMarigny set up an initial meeting between Finney and McGhan in a hotel suite at the Golden Nugget Hotel, wherein McGhan discussed the business of Medicor. McGhan then invited Finney to an upscale restaurant at the Golden Nugget to discuss the potential for investment.[43]

76.    According to Finney, McGhan attempted to bribe him with $5,000 to cause Southwest to make an investment in Medicor.[44]  Finney refused to have Southwest invest any money with McGhan, believing that a start-up venture was not an appropriate investment for Southwest client money.[45]  He did, however, speak with DeMarigny about the meeting and testified that "PJ knew about the whole thing, including the – what I perceived as a bribe."[46]

77.    From Finney's perspective, the issue of Southwest's investment in Medicor seemed to be dead, and Finney moved on with the day to day business of Southwest.  Shortly thereafter (and unbeknownst to Finney), however, the business landscape changed dramatically at Medicor.  In the months and weeks that followed Finney's initial meetings with McGhan, the

---

[40]  DeMarigny set up a meeting with Don McGhan and Tom Gilman at the Four Seasons Hotel in Las Vegas to discuss the debentures and to solicit investments from Smith Barney clients.  *See*, Deposition of Tom Gilman at p. 19.

[41]  Id. at p. 20.

[42]  Deposition of Alan Finney at p. 40.

[43]  Id. at p. 44.

[44]  Deposition of Alan Finney at p. 47, lines 21-22.

[45]  Id. at p. 62, lines 11-12.

[46]  Deposition of Alan Finney at p. 62, lines 19-21.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTER\WK3\7269-001- (SORREL)\7269-007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1   need for financing at Medicor would become increasingly more desperate.  DeMarigny would

2   follow suit with increasingly more desperate tactics to raise money on behalf of his prized

3   client Don McGhan.

### MEDICOR PURCHASES EUROSILICONE

5       78.     In December, 2003, Don McGhan and Medicor made their big play to become

6   relevant in the medical device industry by entering into a handshake deal to purchase a French

7   breast implant business called Eurosilicone, S.A. ("Eurosilicone") located in Apt, France.[47]  At

8   the time McGhan entered into a definitive deal to purchase Eurosilicone for roughly $40

9   Million, Medicor did not have the financing in place to complete the acquisition.  McGhan and

10  Ted Maloney (the CEO of Medicor) attempted to raise $40 Million in financing from the

11  private equity firms Frasier Medical and Galen Partners.[48]   However, according to the

12  testimony of Don McGhan, as well as documents produced in this case, neither Frasier nor

13  Galen would commit to fund the Eurosilicone acquisition by the funding deadline.[49]

14  DeMarigny was quick to help.

15      79.     In the spring of 2004, DeMarigny set up another meeting with Alan Finney at

16  Spanish Trails Country Club, in which McGhan and numerous Medicor executives, including

17  Ted Maloney, the CEO of Medicor, met with Finney to make yet another pitch to raise money

18  from Southwest.[50]  At the meeting, McGhan began asking pointed questions to Finney about

19  Kincaid and Southwest until it "became evident that P.J. had shared with – with Don some

20  personal information about Betty [Kincaid]."[51]   Finney was upset with DeMarigny for

21  disclosing the confidences of his employer to McGhan, and once again declined the invitation

22  to invest Southwest client money in Medicor.[52]  Finney did not tell McGhan why the proposed

---

24  [47] Deposition of Don McGhan at p. 100, lines 5-6.

25  [48] Id. at p. 195, line 9 – p. 197, line 23.

26  [49] Id. at p. 197, lines 17-18.

27  [50] Deposition of Alan Finney at p. 66.

28  [51] Id. at p. 67, lines 20-24.

[52] Id.

**CONSOLIDATED CLASS ACTION COMPLAINT**

investment would be improper in light of Southwest's business, he just refused to invest any money in Medicor.[53]

80.   After this second meeting with Finney, it was obvious to DeMarigny and McGhan that so long as Finney was employed with Southwest, they had no chance to raise money from Southwest.  Finney was an honest employee and would not jeopardize the exchange client funds with risky investments such as Medicor.  DeMarigny and McGhan needed a different angle, and the wheels of the fraud began to turn.  Finney would later testify that "with 20/20 hindsight, I should have seen that P.J. was up to something."[54]

### THE PRESSURE TO FUND THE EUROSILICONE DEAL MOUNTS

81.   Despite popular belief, Don McGhan did not have the financial wherewithal to fund the Eurosilicone acquisition on his own.[55]  McGhan and Medicor were running out of funding options.  The Agreement to purchase Eurosilicone provided for a non-refundable earnest money deposit of $2 Million,[56] a deposit that Medicor would lose unless it funded $30 Million of the purchase price by June 30, 2004, or the first week of July, 2004 at the latest.[57]

82.   DeMarigny knew that McGhan was flying all over the country in an attempt to raise funds for the acquisition.[58]  Indeed, according to Tom Gilman, "P.J. was working hard to try to find places to find the money."[59]  DeMarigny had introduced McGhan to a small investment banking firm in New York called Needham in hopes of securing financing for the

---

[53]  Id. at p. 71, lines 19-23.  McGhan testified that he was not aware of Southwest and did not know what a 1031 company was when he met with Finney.  He only knew from DeMarigny that Finney was in charge of a large fund of money.  This testimony is corroborated by Gilman, who testified that DeMarigny admitted to educating McGhan on the nature of a 1031 business.  See, Deposition of Tom Gilman at p. 80, lines 18-20.

[54]  Deposition of Alan Finney at p. 72, lines 24-25.

[55]  Deposition of Don McGhan at p. 332, line 24 – p. 333, line 10.

[56]  Id. at p. 149, lines 11-18.

[57]  The definitive agreement between Medicor and Eurosilicone reflects a $2 Million earnest money deposit, as well as a June 30, 2004 funding deadline for $30 Million of the $40 Million purchase price.

[58]  Deposition of Tom Gilman at p. 30, lines 3-12.

[59]  Id. at p. 30, lines 11-12.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTER\WK3\7269.001\_(SORRELL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1  Eurosilicone acquisition.[60]   However, thus far, all of DeMarigny's contacts were dead-ends,

2  and all of his promises to raise capital for McGhan were empty.

3       83.    By May, 2004, Finney had twice rebuffed McGhan and DeMarigny's efforts to

4  raise capital through Southwest investments in Medicor, Needham had not come through with

5  financing, and DeMarigny's clients at Smith Barney had invested only a small portion of the

6  $40 Million needed to close the deal with Eurosilicone.   That's when DeMarigny upped the

7  ante and created a bold plan to place all of the Southwest client funds at Smith Barney under

8  the control of Don McGhan.

9              **DEMARIGNY FORMULATES A PLAN TO LOOT SOUTHWEST**

10      84.    DeMarigny knew that Kincaid was in negotiations to sell her stock in Southwest

11  as part of an Employee Stock Ownership Plan (ESOP), in which Finney, Story-Turner and

12  Seitz would become the primary shareholders of the company.[61]   Through confidential

13  discussions with Finney (*i.e.* his client Southwest), DeMarigny also knew the purchase price

14  Kincaid would accept to sell her company.[62]   He understood that if Don McGhan could

15  purchase the company instead of his friend Finney, McGhan would have immediate access to

16  all of the funds necessary to close the Eurosilicone purchase, and DeMarigny would look like a

17  hero to McGhan.   And so, DeMarigny used the information he had learned through his

18  employment with Smith Barney and sold out his friend Finney and his client Southwest by

19  offering up the business to McGhan for the taking.

20      85.    According to the testimony of Don McGhan, DeMarigny informed McGhan that

21  he could immediately access the $40 Million needed to close the purchase of Eurosilicone. "He

22  said he could raise $40 Million for us."[63]

23

24  _____

25  [60]  Deposition of Don McGhan at p. 104, lines 14-21.

26  [61]  The accountant performing the audit of Southwest as a part of the ESOP negotiations interfaced with Smith
    Barney during the audit.  The accountant performing the work was Kate Gilman, who happened to be the daughter
    of Tom Gilman (PJ DeMarigny's business partner and friend at Smith Barney).

27  [62]  Deposition of Alan Finney at p. 85, lines 10-12.

28  [63]  Deposition of Don McGhan at p. 105, lines 11-12.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\WK3\7269.001- (SORREL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

Q:      Okay.   So when you say that PJ told you that he could fund $40 million, he was referring to Southwest Exchange, wasn't he?

A:      Yes.[64]

86.     Although McGhan and DeMarigny asserted the Fifth Amendment when asked specifically if DeMarigny offered up Southwest to McGhan to steal the money on deposit,[65] Tom Gilman confirmed McGhan's above testimony and provided insight into his co-worker's motivation.   According to the testimony of Tom Gilman, "P.J. said he suggested that Don McGhan buy the 1031 company because there's a lot of cash available to invest."[66]  "From the time P.J. and I discussed him telling McGhan about [Southwest] – the reason to tell him and to have him buy it was to *get the cash*."[67]  DeMarigny informed Gilman that McGhan would use the money in the Southwest account at Smith Barney to purchase a breast implant company.[68] With that, DeMarigny became the architect of a massive Ponzi scheme.

### PROJECT SUNNY

87.     Almost immediately after DeMarigny offered up Southwest to McGhan as the source of financing for the Eurosilicone acquisition, McGhan, DeMarigny, Ted Maloney (CEO of Medicor) and Marc Sperberg (the Secretary of Medicor) focused their primary attention on the acquisition of Southwest from Kincaid.   The quickly orchestrated plan to purchase Southwest and loot its coffers became known among the co-conspirators as "Project Sunny."[69]

88.     In a compressed timeframe between May, 2004 and June 28, 2004, the co-conspirators educated themselves on the 1031 exchange business generally, learned about

---

[64]  Id. at p. 331, lines 4-7.

[65]  It should be noted that Smith Barney paid for DeMarigny's legal defense in this matter.

[66]  Deposition of Tom Gilman at p. 80, lines 6-9.

[67]  Id. at p. 29, lines 17-20.

[68]  Id. at p. 27, lines 16-21. DeMarigny later confirmed to Tom Gilman that wire transfers from the Southwest Exchange account funded Eurosilicone. Id. at p. 153, line 24 – p. 154, line 3.

[69]  All expenses related to the purchase of Southwest Exchange (such as flights to meet with Kincaid) were meticulously tracked and billed to a McGhan related company under the name "Project Sunny."

CONSOLIDATED CLASS ACTION COMPLAINT

1   Southwest and Kincaid in particular and then effected the purchase of the company within the

2   nick of time to transfer exchange funds on deposit with Smith Barney to Eurosilicone.  And,

3   DeMarigny provided his valuable assistance every step of the way.

4               *1.      DeMarigny's Reconnaissance on Southwest and Kincaid.*

5         89.     In May, 2004, DeMarigny invited Kate Gilman, the accountant for Southwest

6   and daughter of Tom Gilman (his co-worker at Smith Barney), on a private jet flight with Don

7   McGhan to Reno, Nevada – purportedly for her expertise as a hedge fund accountant.[70]  Under

8   false pretenses, DeMarigny informed Kate Gilman that McGhan needed her expertise for a

9   meeting between McGhan, DeMarigny and some hedge fund investors.[71]  Immediately upon

10  boarding the private jet, Gilman was met by McGhan, DeMarigny and Maloney.[72]

11        90.     During the flight, Kate Gilman learned that Medicor had purchased a breast

12  implant company called Eurosilicone.[73]  She also learned that McGhan had an interest in 1031

13  companies.  McGhan asked Gilman repeated questions about the rules and regulations of a

14  1031 exchange; "What's a 1031 exchange? How does that work? What's like-kind property?

15  What's not?"[74]   Eventually, McGhan and DeMarigny told Gilman "that they were thinking

16  about buying a 1031 company."[75]  DeMarigny disclosed to Gilman that McGhan was in talks to

17  purchase Southwest from Kincaid.[76]

18        91.     Kate Gilman testified that she was bewildered by this revelation because she

19  was currently in the process of completing her audit for the ESOP and had no knowledge that

20

21  _____

22  [70]  Deposition of Kate Gilman at p. 24, lines 9-15.

23  [71]  Id. at p. 27, lines 8 – 10.

24  [72]  Id. at p. 24, lines 17-18.

25  [73]  Id. at p. 29, lines 19-25.  This testimony places the flight at a date sometime after May 17, 2004, when Medicor
    entered into its definitive agreement to purchase Eurosilicone.

26  [74]  Id. at p. 42, lines 21-23.

27  [75]  Id. at p. 43, lines 9-18.

28  [76]  Id. at p. 46, lines 7-10.  This was another lie by DeMarigny, as McGhan would not approach Kincaid for the
    first time regarding Southwest until June 13, 2004.

37 of 88

**CONSOLIDATED CLASS ACTION COMPLAINT**

1  Kincaid planned to sell the company to a third party, much less McGhan.[77]  Ultimately, Gilman

2  had no role in the meeting in Reno and recalls telling her boyfriend after the trip that she was

3  confused as to her presence on the plane.[78]  That is because Gilman had no role on the trip and

4  was invited onto the jet by DeMarigny for no other purpose than to pump her for information

5  on 1031 companies, Southwest and Kincaid.  As a result of the flight (as well as additional

6  research on 1031s and Southwest performed by Marc Sperberg and information from

7  DeMarigny), McGhan had all of the information he needed to approach Kincaid to purchase

8  the company.

9  ### 2.  *Don McGhan Closes the Deal to Purchase Southwest.*

10  92.     The facts and circumstances surrounding McGhan's purchase of Southwest in

11  the days leading up to the funding of Eurosilicone would have been impressive had they not

12  lead to financial ruin for many of the Plaintiffs in this case.  The targeted acquisition of

13  Southwest and the machinery of the fraud worked like clockwork.

- In the days following the flight with Kate Gilman, McGhan located Kincaid with the assistance of Marc Sperberg.  Sperberg contacted a mutual friend of Kincaid's named Claire McDonald and promised her that McGhan would pay $10,000 for Kincaid's contact information.[79]  McGhan paid $10,000 for Kincaid's phone number.[80]

- On June 12, 2004, Sperberg contacted Kincaid on a business trip in Chicago and faxed McGhan's resume to Kincaid in her hotel room at the Meridian Hotel.[81] Sperberg informed Kincaid that McGhan was interested in purchasing her company.[82]

- On June 13, 2004, McGhan put together a team of individuals including Maloney, Sperberg, Nikki Pomeroy (McGhan's Daughter) and David Keys (McGhan's hand

---

[77]  Id. at p. 46, line 23 – p. 47, line 3.

[78]  Id. at p. 28, lines 3-5.

[79]  Deposition of Marc Sperberg at p. 683, lines 9-18.

[80]  Id. at p. 955, lines 16-22.

[81]  Deposition of Betty Kincaid at p. 153, line 19 – p. 154, line 7.

[82]  Id. at p. 157, lines 17-20.

CONSOLIDATED CLASS ACTION COMPLAINT

E:\MATTERS\W3\7269.001- (SORREL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

picked CEO for Southwest) to meet with Kincaid. McGhan chartered his private jet to Chicago.[83]

- Sperberg made arrangements to rent a suite at the Meridian Hotel and invited Kincaid to meet Don McGhan.[84] Maloney and Pomeroy had a laptop computer and printer ready to memorialize the deal to purchase Southwest from Kincaid.[85]

- McGhan met with Kincaid on June 13, 2004, and discussed his long history of success in the business world.[86] McGhan convinced Kincaid that he would grow Southwest into a publicly traded company.[87] Kincaid was impressed with McGhan's knowledge of her business.[88] McGhan then made his pitch to buy the company for $3 Million.

- McGhan told Kincaid that he got Alan Finney drunk and that Finney disclosed the $3 Million purchase price of her company.[89] McGhan then convinced Kincaid to sell 75% of her company for $3 Million and to fire Alan Finney, the individual who had repeatedly placed roadblocks to McGhan's access to Southwest client money.[90]

- As part of the conspiracy, McGhan convinced Kincaid to appoint David Keys the CEO of Southwest on June 16, 2004, two weeks before the scheduled closing date of June 28, 2004.[91] As a result, McGhan (through Keys) had unfettered access to the Southwest accounts two weeks before he owned the company.

- McGhan also created a shell company called Blackstone Limited ("Blackstone") and had opened an account for Blackstone at UBS Financial Services, Inc. ("UBS") on June 14, 2004. Blackstone would function as an "intermediary" to transfer the funds from the Southwest account at Smith Barney to the Eurosilicone account in France. It was not a coincidence that McGhan named his shell company after the famous, private equity firm "The Blackstone Group" in New York City.

---

[83] Deposition of David Keys at p. 25, lines 2 – 10.

[84] Deposition of Betty Kincaid at p. 164, lines 5-6.

[85] Deposition of Ted Maloney at p. 152, lines 4 – 9.

[86] Deposition of Betty Kincaid at p. 165, lines 13-24.

[87] Id. at p. 174, line 21-24.

[88] Deposition of Betty Kincaid at p. 197, line 22 – p. 198, line 1.

[89] Id. at p. 172, lines 20-25. This was a ruse to hide the fact that DeMarigny had disclosed the $3 Million purchase price for Southwest.

[90] Id. at p. 194, line 23 - 195, line 6.

[91] Id. at p. 338, lines 10–14.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTERS\K3\7269-001- (SORBEL)\7269-007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

- On June 15, 2004, the day after opening the account for Blackstone at UBS, McGhan created a holding company called Capital Reef Management Corp. ("CMRC") to purchase Southwest from Kincaid.

93. With the deal to purchase Southwest from Kincaid negotiated and memorialized in writing, and with the machinery in place to immediately transfer Southwest client funds from Smith Barney to Blackstone to Eurosilicone, McGhan simply needed to raise the $3 Million purchase price for the company. DeMarigny once again offered his services.

> ### 3. DeMarigny Assists McGhan with a Plan to Raise the $3 Million Purchase Price for Southwest by Stealing Exchange Client Funds on Deposit with Smith Barney.

94. On June 16, 2004, the very same day that Kincaid appointed David Keys as the new CEO of Southwest, DeMarigny approached Kincaid with a blank, corporate resolution form from Smith Barney.[92] DeMarigny falsely informed Kincaid that she needed to sign the document in order to provide the new CEO David Keys with the ability to speak with Smith Barney representatives about the Southwest account.[93] In reality, the blank corporate resolution – as later filled in by DeMarigny[94] – provided David Keys with unfettered access and the ability to wire transfer money out of the Smith Barney account.

95. With the corporate resolution in hand, DeMarigny provided David Keys with a letter of authorization to transfer $5 Million from Southwest to Blackstone.[95] Schofield testified that DeMarigny wanted the $5 Million transfer to happen.[96] So, DeMarigny convinced Keys to execute the letter of authorization to wire transfer $5 Million from the Southwest account at Smith Barney to the "Blackstone" account at UBS by falsely telling Keys that the money would be invested for the benefit of the exchange clients in the private equity

---

[92] Deposition of Bernard Schofield at p. 231, line 22 – p. 232, line 11.

[93] Id. at p. 233, lines 19–23.

[94] Schofield authenticated the handwriting on the corporate resolution as that of P.J. DeMarigny.

[95] Deposition of David Keys at p. 249, lines 4–10.

[96] Deposition of Bernard Schofield at p. 332, lines 20–21.

CONSOLIDATED CLASS ACTION COMPLAINT

1    firm "The Blackstone Group" in New York City.[97]   Tom Gilman confirmed the fraudulent

2    nature of the "Blackstone" transaction solicited by DeMarigny when Gilman testified that PJ

3    did not want Keys to know where the "investments" were really being held.[98]

4         96.    Based upon DeMarigny's false representations, Keys executed the $5 Million

5    letter of authorization to Blackstone and initiated the wire transfer.[99]   However, Smith Barney

6    refused to wire the money.[100]   The proposed transfer of funds did not meet the protocol in place

7    at Smith Barney requiring the final approval of Kincaid.[101]   Schofield confirmed that Kincaid

8    was not aware of the proposed transfer and that Keys (contrary to the corporate resolution

9    DeMarigny falsely obtained) did not have the authority to move money without her consent.[102]

10        97.    On June 21, 2004, Kincaid removed PJ DeMarigny from the Southwest account

11   at Smith Barney as a direct result of the incident involving the blank corporate resolution and

12   the failed transfer of $5 Million to Blackstone. Schofield testified that Kincaid wanted

13   DeMarigny removed from the account and that Barron confirmed this fact with Kincaid.[103]

14   According to Schofield, DeMarigny did not seem upset that Kincaid had requested his removal

15   from the Southwest account,[104] a fact confirmed by Barron.[105]   The reason was obvious.

16   DeMarigny already knew McGhan would purchase the company and make him the sole

17   account representative based upon the plan DeMarigny had concocted.

18   ///

19

20   _____

21   [97]  Deposition of David Keys at p. 93, 96, 343, 344.

22   [98]  Deposition of Tom Gilman at p. 94, lines 14–22.

23   [99]  Deposition of Bernard Schofield at p. 241.

24   [100]  Id. at p. 242, lines 22–23.

25   [101]  Deposition of Bernard Schofield at p. 242, line 25 – p. 243, line 6.

26   [102]  Deposition of Betty Kincaid at p. 240, lines 22–23.

27   [103]  Deposition of Bernard Schofield at p. 322, lines 25 – p. 323, line 4.

28   [104]  Id. at p. 392, line 23 – p. 393, line 3.

[105]  Deposition of Robert Barron at p. 238, lines 1 – 4.

CONSOLIDATED CLASS ACTION COMPLAINT

E:\MATTERS\W3\7269.001 - (SORREL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

98.     By June 16, 2004, DeMarigny had subverted the protocol in place regarding the Southwest account in his attempt to end-run Kincaid's consent to the transfer of funds to "Blackstone." DeMarigny came within one step of stealing the $3 Million needed to close the purchase of Southwest to an account controlled by McGhan. Yet, Smith Barney did not reprimand DeMarigny for his conduct,[106] or treat the incident as a red flag of potentially fraudulent activity within the Southwest account. Instead, Smith Barney assigned Schofield as the sole account executive for Southwest and business continued as usual.

### 4.     DeMarigny Assists McGhan with a Plan to Raise the $3 Million Purchase Price for Southwest from DeMarigny's Clients at Smith Barney.

99.     Rebuffed in his effort to steal the $3 Million purchase price for Southwest from the Smith Barney account, DeMarigny began to solicit his clients at Smith Barney to invest in a $3 Million "Bridge Loan" for Southwest. The documents produced by Smith Barney demonstrate that DeMarigny solicited a Smith Barney client named Marty Faber to make the entire $3 Million investment for McGhan's purchase of Southwest. Faber confirmed the solicitation by PJ DeMarigny in his deposition, but Faber ultimately refused to invest any money and later reported DeMarigny to Smith Barney management.[107]

100.     DeMarigny then solicited a client named Tom Richards to invest $1.5 Million in the $3 Million "Bridge Loan."[108] DeMarigny and Tom Gilman shared Richards as a client and DeMarigny informed Gilman that Richards made a $1.5 Million investment expressly related to the purchase of Southwest.[109] In exchange for making less than a one-week loan, McGhan paid Richards $150,000. Maloney, Sperberg and McGhan's lawyer (Patrick Byrne) funded the remaining $1.5 Million of the $3 Million purchase price for Southwest. Thanks to DeMarigny,

---

[106] Deposition of Robert Barron at p. 364, lines 16-22.

[107] Deposition of Robert Barron at p. 138, lines 20-24. Even after reviewing the Faber solicitation to finance the $3 Million purchase price for Southwest Exchange (which identified PJ DeMarigny), Barron did not believe that DeMarigny had anything to do with the Southwest transaction. Id. at p. 276, lines 15-22.

[108] Deposition of Tom Gilman at p. 77.

[109] Deposition of Tom Gilman at p. 77, line 24, - p. 78, line 2.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTERS\WK3\7269.001- (SORRELL)\7269.007 Transferred Litigation USDC New Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

McGhan had the financing necessary to close the deal with Kincaid.  Now, DeMarigny and McGhan simply needed to fund the transaction, which occurred as follows:

- On June 23, 2004, DeMarigny prepared false documentation to open an account at Smith Barney for Capital Reef Management Corp. (CRMC), the holding company for Southwest.[110]

- On June 24, 2004, Smith Barney management signed off on the false documentation and opened the account for CRMC despite numerous red flags within the documents.[111]

- On June 26, 2004, McGhan and Maloney flew to Portland, Oregon to pick up Kincaid from a business trip.[112]  McGhan and Maloney lied to Kincaid, stating they were on their way back from Seattle.  In reality, they made a special trip to get the documents executed in order to beat the ticking clock on the Eurosilicone deal.

- Betty Kincaid signed the Purchase Agreement for Southwest Exchange on the jet flight home from Portland, Oregon.[113]

- On June 28, 2004, the newly formed CRMC wire transferred $3 Million to another account at Smith Barney owned by Kincaid.[114]  McGhan successfully closed the purchase of Southwest with the money raised by DeMarigny.

### 5.   *DeMarigny and McGhan Gain Control of the Southwest Account at Smith Barney.*

101.   With the Purchase Agreement signed and the money paid to Kincaid, DeMarigny and McGhan moved quickly to gain control of the Southwest account at Smith Barney. [115]  On the morning of June 28, 2004, McGhan, Maloney and Pomeroy arrived at the Smith Barney offices, met with DeMarigny and collectively demanded that Smith Barney

---

[110]  Plaintiffs' handwriting expert has opined that the handwriting on the "Enhanced Due Diligence" questionnaire is consistent with the authenticated handwriting of PJ DeMarigny on the blank Corporate Resolution.

[111]  For instance, the document identified Nikki McKikkin (Pomeroy's e-mail moniker) as the bank officer for Capital Reef Management Corp. located in Santa Barbara, CA.  However, the phone number provided as contact information for "McKikkin" had a Las Vegas area code.

[112]  Deposition of Betty Kincaid at p. 354, lines 5-9.

[113]  Id. at p. 354. lines 19-22.

[114]  This should have been another red flag of DeMarigny's involvement in the fraud, since DeMarigny's new client CRMC (McGhan) purchased his existing client Southwest.

[115]  Deposition of Bernard Schofield at p. 341, lines 18-23.

CONSOLIDATED CLASS ACTION COMPLAINT

1   management immediately remove Schofield from the Southwest account and replace him with

2   DeMarigny.

3       102.    On June 28th, Barron (the branch manager) was on a cruise in Alaska and Tanya

4   Escobedo ("Escobedo")(the operations manager) took over as the *de facto* branch manager.[116]

5   McGhan, Maloney, DeMarigny and Pomeroy marched into Escobedo's office unannounced

6   demanding that Smith Barney turn over control of the Southwest account to McGhan and

7   CRMC, with DeMarigny as the new financial consultant for Southwest.[117] Escobedo recalled a

8   "certain sense of urgency," and that the group was "trying to push their will on me."[118]

9   Ultimately, Escobedo capitulated with the demands made by McGhan, DeMarigny and their

10  co-conspirators on the morning of June 28th. As a result, DeMarigny took over as the sole

11  account executive for Southwest on June 28, 2004, and McGhan and DeMarigny gained

12  unfettered control of roughly $40 Million in Southwest client funds on deposit with Smith

13  Barney.

14                           **THE FLEECING OF SOUTHWEST EXCHANGE**

15      103.    On June 28, 2004, the date McGhan and DeMarigny gained control of the

16  Southwest account at Smith Barney, Medicor had only days to fund $30 Million of the

17  Eurosilicone purchase price. With DeMarigny's help and the assistance of Smith Barney

18  management, money began to fly out of the Southwest account at a blistering pace.

19          *1.*    *The $5 Million Wire Transfer to "Blackstone" on June 29, 2004.*

20      104.    On the morning of June 29, 2004, McGhan (who was again at the Smith Barney

21  office) and DeMarigny demanded that Escobedo transfer $5 Million from the Southwest

22  account at Smith Barney to the Blackstone account at UBS – the same "Blackstone" that

23  DeMarigny had improperly attempted to wire $5 Million on June 16, 2004. Smith Barney

24  hastily facilitated the wire transfer, even though management had a duty to know "Blackstone,"

25  _____

26  [116] Deposition of Tanya Escobedo at p. 46. Escobedo was a relatively new manager and filled in for Barron. Id. at p. 50, lines 3-8.

27  [117] Id. at p. 51- 52.

28  [118] Id. at p. 51, lines 12-14.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\WK3\7269 001- (SORREL)\7269 007 Transferred Litigation\USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

the third party recipient of the wire transfer.[119]

105.    In order to free up the cash necessary to make $30 Million of anticipated wire transfers to Blackstone (and then on to Eurosilicone in Apt, France), McGhan and DeMarigny liquidated numerous securities holdings within the Southwest account and accessed the "Portfolio CreditLine" at Smith Barney in the amount of $29 Million.[120]   Schofield testified that prior to June 28, 2004, Southwest did not use its credit line,[121] and that he had never seen the type of account activity that would ensue June 29th and June 30th in the history of the Southwest account at Smith Barney.[122]   Red flags were flying at full mast.  Indeed, on the day of the $5 Million transfer to Blackstone, Escobedo recalled there being a sense of urgency surrounding the Southwest account and the anticipated wire transfer,[123] yet another red flag.  Nonetheless, Escobedo handled the wire transfer on June 29th in spite of her nagging concern that something "didn't feel right."[124]

**2.    The $24 Million Wire Transfer to "Blackstone" on June 30, 2004.**

106.    On June 30, 2004, Don McGhan arrived at the offices of Smith Barney for the third straight day again requesting to transfer funds to "Blackstone."  McGhan and DeMarigny used up the remainder of the $29 Million "Portfolio CreditLine" and demanded that Escobedo transfer $24 Million from the Southwest account at Smith Barney to the Blackstone account at UBS to complete the Eurosilicone deal.  Escobedo once again handled the wire transfer.

107.    The documents produced by Smith Barney demonstrate that McGhan and DeMarigny pressured Escobedo to complete the wire transfer on June 30, 2004.  DeMarigny

---

[119]   Deposition of Donna Dunbar at p. 17, lines 4-10.

[120]   The "Portfolio CreditLine" was nothing more than a margin loan for Southwest at Smith Barney. The Smith Barney account did not have $30 Million in cash, and the sale of securities would not settle in time for the June 30, 2004 funding deadline.   Therefore, Southwest borrowed against the securities in the account by using the "Portfolio CreditLine" offered by Smith Barney.

[121]   Deposition of Bernard Schofield at p. 299, lines 19-23.

[122]   Id. at p. 294, lines 7-10.

[123]   Deposition of Tanya Escobedo at p. 51, 261, lines 16-25.

[124]   Deposition of Tanya Escobedo at p. 567, lines 1-5.

CONSOLIDATED CLASS ACTION COMPLAINT

1  sent e-mails to Escobedo indicating that the client (Southwest) would "walk" if the transfer was

2  not complete.[125]  In one e-mail, DeMarigny wrote "Tan, I'm ulcering over here.  I would like

3  Don to leave, which he'll do when we know it went. If you can call that last step person to

4  speed up the process or twist an arm my stomach would appreciate it."  Don McGhan forced

5  DeMarigny to miss a scheduled flight to the Bahamas on June 30th in order to ensure that

6  Smith Barney completed the wire transfers on time.[126]  DeMarigny and McGhan were feeling

7  the pressure.

8       108.   Prior to completing the $24 Million wire transfer to "Blackstone," on June 30,

9  2004, Smith Barney employees knew and understood that McGhan intended to use the

10  exchange client funds for purposes unrelated to the completion of a 1031 exchange.   For

11  example, Tanya Escobedo testified that she contacted UBS on June 30, 2004, before the $24

12  Million transfer was complete and discovered the client funds wired on June 29th and

13  scheduled for wiring on June 30th were destined for France.[127]  Also, Smith Barney regional

14  manager Donna Dunbar created a chart of events on June 30, 2004, detailing McGhan's

15  acquisition of Southwest, the Southwest account activity, the relationship with Medicor and the

16  ultimate destination of the client funds.[128]  Dunbar's chart of events on June 30, 2004, set out

17  the facts of the fraud in exacting detail.   According to the chart, Smith Barney knew that

18  CRMC purchased Southwest for $3 Million, that Schofield was removed from the Southwest

19  account, that Southwest then transferred $29 Million in client money to "Blackstone" on June

20  29th and June 30th, and that Blackstone used the client money on behalf of Medicor to

21  purchase a company in France.  Smith Barney also knew that McGhan and DeMarigny planned

22  to transfer another $12 Million of client funds out of the account on July 1st and July 2nd, the

23  following two days.

---

[125] Id. at p. 281, lines 5-10.

[126] Deposition of Tanya Escobedo at p. 489, 491, lines 2 – 6.  McGhan would fly DeMarigny and his wife to the Bahamas the next day on his private jet.

[127] Deposition of Tanya Escobedo at p. 651, line 16 -652, line 1.

[128] Deposition of Donna Dunbar at p. 67 - 68.

CONSOLIDATED CLASS ACTION COMPLAINT

109.    It is difficult to imagine a use of funds more inconsistent with the business of a 1031 company than the purchase of breast implant company in France.  Yet, with knowledge that Don McGhan intended to use exchange funds for that exact purpose, Tanya Escobedo approved the wire transfer of $24 Million on June 30, 2004, seemingly without any real concern from Smith Barney.  In fact, Donna Dunbar and AML employee Robert Grossman exchanged e-mails back and forth on June 30th joking that "Blackstone is buying Paris," or that client funds would be used "in a swap for the real Eiffel Tower."

### THE PAYOFF

110.    By June 30, 2004, Escobedo had completed the wire transfer of $29 Million to Blackstone, and McGhan had virtually all of the money necessary to fund the Eurosilicone transaction. DeMarigny successfully aided McGhan in the theft of $30 Million from Southwest and came through on his promise to finance the Eurosilicone transaction.  For his efforts, McGhan whisked DeMarigny and his wife to the Bahamas on his private jet on July 1, 2004.[129] McGhan also paid DeMarigny $150,000 (with a check paid to his wife in order to disguise the payment), as well as a significant number of shares in Medicor valued at approximately $1 Million.[130]

### THE ANTI-MONEY LAUNDERING INVESTIGATION

111.    Based upon the account activity on June 29th and June 30th, 2004, Smith Barney instituted an Anti-Money Laundering (AML) investigation of Southwest Exchange and Don McGhan. David McNair (the manager of the AML department) confirmed that the money transferred to "Blackstone" had been immediately wired overseas[131] to purchase a French breast implant company, making the transfers totally inconsistent with the business purpose of

---

[129]  Deposition of Tom Gilman at p. 65, lines 1-13

[130]  Deposition of Tom Gilman at p. 57 – 58.

[131]  Deposition of David McNair at p. 66, lines 4-8.

**CONSOLIDATED CLASS ACTION COMPLAINT**

1    Southwest.[132]   Robert Grossman (AML investigator) and McNair considered the possibility that

2    McGhan (through CRMC) had acquired Southwest in order to gain access to the exchange

3    funds to finance the purchase of the French breast implant company.[133]   McNair also

4    considered the possibility that McGhan's "Blackstone" was named after the famous

5    "Blackstone" in order to disguise the improper transfer of funds.[134]   Grossman conducted

6    internet research on McGhan using the search terms "crime," "fraud," "launder," "indict" and

7    "convict."[135]   The search revealed that McGhan had significant, prior issues with the SEC.

8          112.   Ultimately, in light of the large wire transfers of money immediately after the

9    change in ownership of Southwest to Don McGhan (as well as McGhan's documented

10   problems in the past), the AML department developed serious concerns regarding the ongoing

11   misappropriation of funds by McGhan and Southwest.[136]   AML communicated its concerns to

12   Smith Barney local manager Barron.   However, Barron stuck his head in the sand and allowed

13   the theft of other people's money to continue unabated in his office.   In fact, Barron

14   affirmatively withheld information regarding Southwest, DeMarigny and McGhan contained in

15   "the Schofield Letter" from the AML investigation, thereby continuing to aid and abet the

16   misappropriation of additional client funds.

17                          THE SCHOFIELD LETTER

18          113.   On July 5, 2004 (almost at the inception of the AML investigation), Bernard

19   Schofield – then former financial consultant for Southwest – submitted a detailed, six page

20   letter to Smith Barney branch manager Barron recounting Schofield's personal knowledge of

21   the activities of McGhan and DeMarigny with respect to the Southwest account.   According to

22

23   _____

24   [132]   Id. at p. 99, lines 19-22.  McNair conceded that the overseas transfer of money to a French breast implant
     company would make it highly improbable that Southwest could fund the 1031 exchanges of its clients. Id. at p.
     100, line 25 – p. 101, line 5.

25   [133]   Deposition of Robert Grossman at p. 71, line 25 – p. 72, line 6.

26   [134]   Deposition of David McNair at p. 110, line 12-15.

27   [135]   Deposition of Robert Grossman at p. 47.

28   [136]   Deposition of David McNair at p. 68.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTER\WK3\7269-001- (SORREL) \7269-007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1    Schofield, the point of the letter was to inform Smith Barney management that DeMarigny had

2    solicited McGhan's purchase of Southwest.

3        **Q:**    And you believe that P.J. solicited McGhan's purchase of   Southwest

4                 Exchange, correct?

5        **A:**    That's what I believed.

6        **Q:**    Why did you believe that?

7        **A:**    I believed that because I thought that P.J. had knowledge of the

8                 account, I think he had knowledge of Don McGhan, *and I pretty well*

9                 *believe that's the point of this letter.*[137]

10       114.   In the letter, Schofield accused DeMarigny of orchestrating McGhan's purchase

11   of Southwest and discussed whether someone was "trying to embezzle money."[138]   The letter

12   detailed DeMarigny's delivery of the blank corporate resolution to Kincaid on June 16th and

13   his attempt to transfer $5 Million to "Blackstone" prior to the completion of the sale.  The letter

14   also discussed in detail Schofield's removal from the Southwest account at the behest of

15   McGhan and the subsequent transfer of $30 Million to "Blackstone" in the ensuing days.

16   Simply put, the Schofield letter painstakingly detailed the ongoing fraud and the role played by

17   DeMarigny in McGhan's purchase of Southwest.

18       115.   Barron read the Schofield letter on July 6, 2004, the day after he returned from

19   his Alaskan cruise.[139]   Despite the detailed nature of the letter and the repeated references to

20   DeMarigny's involvement with McGhan and Southwest (as well as transfers to the now

21   infamous "Blackstone"), branch manager Barron did not forward the letter to the legal

22   department, to the AML department in New York or to anyone else for that matter.[140]   He

---

[137] Deposition of Bernard Schofield at p. 347, line 25 – p. 348, line 7.

[138] Schofield Letter at SMB0000590.

[139] Deposition of Robert Barron at p. 96.

[140] Id. at p. 99.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTER\W\317269.001.(SORREL)\17269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Complaint\Consolidated Complaint 12-23-08.doc

1   "didn't think that was necessary."[141]   Barron testified that he considered the letter nothing more

2   than a fee dispute by a "disgruntled" broker and never changed his opinion of the letter.[142]

3   **Q:**    – and that's why you didn't follow up on this letter?

4   **A:**    I think Bernie was making a lot of unalleged or unsubstantiated

5          allegations, and I still feel that way.

6   **Q:**    You say you still feel that way.  When you read this letter today, you still

7          believe that Mr. Schofield was making unsubstantiated allegations?

8   **A:**    That's correct.[143]

9       116.   In fact, even after the AML department contacted Barron regarding its

10  investigation into Southwest and the transfer of funds to "Blackstone," Barron did not forward

11  the letter to McNair or Grossman.  Barron testified that he "didn't think these allegations shed

12  any light on [the investigation]."[144]

13  **Q:**    Well, when you saw the word "embezzle," it didn't alert you that maybe I

14         ought to go ask Bernie about why he's making this statement?

15  **A:**    It did not.[145]

16      117.   The promise of fees and commissions on the Southwest account made Barron

17  willfully blind to the truth.  DeMarigny promised Barron that McGhan would replenish the

18  Southwest account with $80 Million from Merrill Lynch and Silver State Bank,[146] an

19  unprecedented amount of business that would have resulted in significant fees and

20  commissions for Smith Barney.[147]   Barron took DeMarigny at his word.   He never asked

21

22  [141]  Id. at p. 99, lines 12-17.

23  [142]  Id. at p. 96, line 25 – p. 97, line 12.

24  [143]  Id. at p. 686, lines 13-21.

25  [144]  Id. at p. 99, line 24 – p. 100, line 4.

26  [145]  Id. at p. 679, lines 18-21.

27  [146]  Id. at p. 144, lines 10-25, *see, also* p. 168, 425.

28  [147]  Smith Barney and its brokers made $500,000 in 2003 on a Southwest account containing $40 Million under
    management.

CONSOLIDATED CLASS ACTION COMPLAINT

anyone to explain the purpose of the wire transfers to "Blackstone,"[148] and to this day believes that DeMarigny did not solicit McGhan's purchase of Southwest[149] or the wire transfers from Southwest to the Blackstone account at UBS.[150]  Barron could not have been more willfully blind to the fraud perpetrated under his nose.  Schofield laid out a roadmap of the fraud in his letter to Barron, and Barron buried the letter in a file.[151]

**"PJ WAS NOT THE SUBJECT OF OUR INVESTIGATION."**
*-- ROBERT GROSSMAN* [152]

118.    David McNair from the AML department testified that he was not aware of the failed transfer on June 16, 2004 to "Blackstone," that he did not know DeMarigny had solicited Kincaid's signature on the blank corporate resolution or that Finney had been terminated the same day.[153]  McNair also had no idea that Kincaid removed DeMarigny from the Southwest account in June, 2004, just prior the sale of the company.[154]  Further, McNair was not aware that DeMarigny and McGhan showed up at Smith Barney on June 28, 2004, demanding that Schofield be removed from the Southwest account and replaced by DeMarigny just days before the $30 Million wire transfers to "Blackstone."[155]  In short, McNair knew nothing of the facts contained within the Schofield letter.

119.    McNair conceded that the forgoing information regarding DeMarigny and Southwest would have been a red flag for fraud.[156]  McNair also testified the information

---

[148] Deposition of Robert Barron at p. 111.  Smith Barney policy makes it advisable to obtain the reason for any client request to send a third-party fed fund wire.

[149] Id. at p. 305, lines 9-15.

[150] Id. at p. 236, lines 2-5.

[151] Deposition of Robert Barron at p. 99, lines 12- 17.

[152] Deposition of Robert Grossman at p. 25, line 14-15.

[153] Deposition of David McNair at p. 76, line 16 – p. 77, line 23.

[154] Id. at p. 79, lines 2-6.

[155] Id. at p. 128, line 19 – p. 129, line 1.

[156] Id. at p. 129, lines 2-7.

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTER\WAW\17269.001- (SORREL) \17269.007 Transferred Litigation USDC Nev. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

would have assisted in knowing the history of the account.[157]   Robert Edwards ("Edwards"), the head of the entire AML department for CitiGroup/Smith Barney, took McNair's position one step further.

If I was conducting an investigation and these allegations made by Mr. Schofield existed, I would want to know them during the course of my investigation.

**Q.**    Why?

**A.**    Because the allegations appear to call into question involvement of P.J., the
         broker.

**Q.**    Involvement in what way?

**A.**    There is an allegation in the letter that P.J. had had the previous owner sign a
         blank corporate resolution and had attempted to transfer money using that.[158]

**Q:**    You would have expected that Mr. Barron would have forwarded this to the
         AML unit, correct?

**A.**    Yes.[159]

120.   As a direct result of Barron's incomprehensible failure to deliver the Schofield letter to AML, Schofield was <u>not</u> interviewed as part of the AML investigation into Southwest,[160] and McNair stated "we were not aware of any information that I can recall that would have made him [DeMarigny] a subject to our review."[161]   Accordingly, McNair did not believe anyone at Smith Barney, including DeMarigny, engaged in any improper activity with respect to the money wired out of the Southwest account.[162]

---

[157]  Id. at p. 79, lines 13-24.

[158]  Deposition of Robert Edwards at p. 211, lines 12-23.

[159]  Id. at p. 212, lines 22-24.

[160]  Deposition of Bernard Schofield at p. 394, lines 3 -7.

[161]  Deposition of David McNair at p. 180, lines 20-22.

[162]  Id. at p. 124, line 21 – p. 125, line 3.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\WK317260 001- (SORREL)\17260 007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

**"WHEN THE MONEY LEAVES SMITH BARNEY, WE ARE NO LONGER INVOLVED WITH IT."**

*-ROBERT BARRON*[163]

121.    In the days and months following the AML investigation into Southwest that had uncovered a fraud, the actions of Smith Barney can only be described as perplexing. While management should have been the first line of defense to money laundering,[164] Barron and Escobedo continued to follow the directives of McGhan and DeMarigny, wire transferring millions of dollars out of the Southwest account.[165]  According to Barron, "we were in charge of wiring a transfer or wiring the funds out to the client.  All the documents were in place.   The client made the request and we fulfilled the client's wishes. *The end result was not part of our responsibility.*"[166]

122.    Even though Barron learned from Escobedo that money was moving from Southwest to "Blackstone" at UBS and then moving further on to finance the acquisition of Eurosilicone,[167]  Barron testified he had no reason to believe the transaction was improper.[168] In fact, Barron stated that he "wanted to [retain] Southwest as a client until they absolutely left, which was sometime in late August or September."[169]  Smith Barney management could not have cared less what McGhan and DeMarigny did with the client money on deposit at Smith Barney, so long as Smith Barney made its fees and commissions.  Indeed, Barron's inability to answer the following question revealed the institutional mindset of Smith Barney.

Q:    So I take it from your testimony, Mr. Barron, that if Mr. McGhan was stealing money through Smith Barney, you didn't care if you would have

---

[163] Deposition of Robert Barron at p. 442, lines 22-24.

[164] Id. at p. 574, line 17 – p. 575, line 1.

[165] Smith Barney wire transferred $18.5 Million to UBS in July, 2004, and another $5 Million to UBS in August, 2004.

[166] Deposition of Robert Barron at p. 476, lines 21-25.

[167] Id. at p. 191, lines 13-20.

[168] Id. at p. 192, lines 2-6.

[169] Id. at p. 604, lines 8-10.

CONSOLIDATED CLASS ACTION COMPLAINT

1      gotten a profit on it?

2      **A:**      That's just too much of a hypothetical for me.[170]

3      123.    The simple answer to this question should have been "No." It was "too much of

4  a hypothetical" to answer the question because Barron possessed a moral compass that pointed

5  only in the direction of fees and commissions on the account. "It's not my job to determine

6  whether somebody lost money. . . I just – that's not my concern.    That's not my

7  involvement."[171]  "I wanted to maintain [Southwest] as a client all the way through this."[172]

8  Given Barron's laissez-faire attitude regarding the theft of money, it is not surprising that

9  McGhan and DeMarigny wiped out the remainder of the Southwest account in July and

10  August, 2004, with the assistance of Smith Barney management.

11      *1.      Smith Barney Fails to Stop the Hemorrhaging of Cash.*

12      124.    Unlike Barron, the AML department was focused on the "end result" of the wire

13  transfers to "Blackstone" and suspected improper activity in the Southwest account as early as

14  June 30, 2004.  Unfortunately for the Plaintiffs, the Smith Barney AML department did not

15  simply put an end to the wire transfers, and actually facilitated the total depletion of the client

16  money on deposit in the Southwest account.

17      125.    Instead of prohibiting any further wire transfers of client money from the

18  Southwest account, the AML department placed a "restriction" on the Southwest account on

19  June 30, 2004, allowing only transfers of funds to a "same named account."[173]   In other words,

20  the AML department did not want Southwest or McGhan transferring any more client funds to

21  "Blackstone," or any other third party, but would allow transfers to an account opened in the

22  name of Southwest.

23  ///

24

25  [170]  Id. at p. 525, lines 14-21.

26  [171]  Deposition of Robert Barron at p. 651, lines 11-14.

27  [172]  Id. at p. 605, lines 5-6.

28  [173]  Deposition of Robert Grossman at p. 58, lines 5-10.

**CONSOLIDATED CLASS ACTION COMPLAINT**

1    126.    Tanya Escobedo contacted McGhan to inform him of the "same name account"

2    restriction, thereby providing McGhan with a road map to remove the remainder of exchange

3    funds on deposit with Southwest.[174]  As a result, McGhan simply opened an account at UBS in

4    the name of Southwest Exchange that day in order to continue the fleecing of Southwest.

5    According to Grossman, "we had reason to believe at that time that there was potential for

6    fraudulent or other criminal behavior,"[175] and restricting wire transfers to a "same named

7    account" would lower the risk of money laundering.

8    **Q:**    Well, did you ever stop and think once the money leaves Smith Barney

9         and goes to a Southwest account at UBS, then it will just be transferred

10         out of that account to a third party?

11    **A:**    We can't prevent the monies from being wired out of the account.

12                              ***

13    **A:**    . . .we can only restrict the funds movement out of an account if we have a

14         TRO or other sort of court order.[176]

15    **Q:**    Did Smith Barney seek a court order to prevent the transfer of money out

16         of the Southwest Exchange account at Smith Barney?

17    **A:**    No. [177]

18    127.    Ultimately, restricting wire transfers to a "same named account" at UBS did

19    nothing.  Smith Barney's anemic response appears to have been nothing more than a tactical

20    decision by AML to reduce Smith Barney's exposure to liability and to shift a massive problem

21    to UBS.  Indeed, Grossman conceded that the "same named account" restriction on Southwest

22    did nothing to prevent the transfer of exchange client funds overseas.[178]   Instead, it simply

---

[174] Deposition of Tanya Escobedo at p. 412, line 16 – p. 413, line 4.

[175] Deposition of Robert Grossman at p. 58, lines 5-10.

[176] Id. at p. 59, lines 7-16.

[177] Id. at p. 61, lines 17-22.

[178] Id. at p. 64, lines 12-15.

CONSOLIDATED CLASS ACTION COMPLAINT

E:\MATTERS\WK3\7268-001- (SORRELL)\7268-007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

transformed a Smith Barney problem into a UBS problem,[179] as McGhan and DeMarigny continued to wire transfer money out of the Southwest account at Smith Barney at a blistering pace.

128.   While Smith Barney placed ineffective "restrictions" on the Southwest account, McGhan simply transferred another $17.8 Million out of the Smith Barney account in July, 2004. McGhan transferred another $7.3 Million out of the Smith Barney account in August, 2004. In fact, Barron personally approved a wire transfer of $5 Million from the Southwest account at Smith Barney to the Southwest account at UBS on August 2, 2004, even though he never spoke with David Keys (the CEO of Southwest), or Nikki Pomeroy (the Southwest account representative) prior to approving the wire transfer.[180]

### 2.   Smith Barney Management Contacts Don McGhan.

129.   On August 3, 2004, a full month after Smith Barney uncovered the fraud, Barron contacted Don McGhan at the direction of AML.[181] Barron testified that based on McGhan's reaction, he "must have known I was going to call him some way."[182] Barron purportedly asked McGhan whether DeMarigny had solicited the transaction in which CRMC purchased Southwest.[183] According to Barron, McGhan stated "No," that a friend of Marc Sperberg had introduced him to Kincaid and Southwest.[184] Barron took McGhan at his word, stating that it never crossed Barron's mind that McGhan might lie to him.[185] Barron never asked McGhan why he would want to purchase Southwest,[186] or why the money from

---

[179]  It is therefore not surprising that Smith Barney's expert has opined that UBS (not Smith Barney) should have stopped the wire transfers overseas. *See,* Smith Barney expert report.

[180]  Id. at p. 567-568.

[181]  Id. at p. 496, lines 19-23, p. 562, lines 21-23.

[182]  Id. at p. 500, lines 24-25.

[183]  Id. at p. 562, lines 2-7.

[184]  Id. at p. 117, lines 1-8.

[185]  Id. at p. 118, lines 1-3.

[186]  Id. at p. 499, lines 21-23.

CONSOLIDATED CLASS ACTION COMPLAINT

1  Southwest had gone to the Blackstone account at UBS.[187]   The conversation lasted five

2  minutes.

### 3.  *Smith Barney Management Meets with DeMarigny.*

4      130.    On August 5, 2004, branch management Barron and Escobedo met with Robert

5  Perry and Donna Dunbar (regional managers of Smith Barney) and DeMarigny in the Las

6  Vegas office of Smith Barney.[188]  According to Barron, the "overriding discussions" were the

7  Southwest account and the "financial wherewithal of Mr. McGhan."[189]  "The perception was

8  that Mr. McGhan was the primary mover or the primary holder, primary responsible person

9  behind the Southwest account."[190]

10     A:    Well, I think that they felt like he was the controller.  Whether he was the

11           majority owner or not, it was perceived that he was the control person and

12           there was a lot of money being moved, and I guess they just wanted to

13           have a comfort that maybe *we weren't being at risk or something*.[191]

14     131.    It appeared that everyone at the meeting was concerned with something other

15  than the wholesale fleecing of Southwest client money.  While Barron was concerned that

16  Smith Barney was not "at risk or something," Donna Dunbar felt concerned that DeMarigny –

17  their star broker – might leave the firm.

18     A:    As I recall, we were concerned about P.J. leaving.  And I don't know how

19           that came up.  I wasn't privy to any sort of knowledge.  I just recall that –

20           that was one of the considerations.   And I think we had an inkling that

21           Southwest was going to transfer their accounts, and when you have a

---

[187]  Id. at p. 498, lines 12-15.

[188]  Id. at p. 453.

[189]  Id. at p. 453, lines 21-23.

[190]  Id. Deposition of Robert Barron (Highly Confidential Transcript, Volume IV) at p. 26, lines 12-14.  McGhan was not the majority owner of CRMC or Southwest, and had no authority over the Southwest account at Smith Barney.

[191]  Id. at p. 457, lines 1-6 (emphasis added).

financial advisor who loses business, you're concerned about them.  So to the best of my recollection, that is what we would have talked to P.J. about.

**Q:**   Did you talk about the activity in the Southwest Exchange account?

**A:**   I didn't specifically talk about anything.  I pretty much just watched P.J. [192]

132.   Dunbar observed that DeMarigny was "licking his lips a lot.  His mouth was dry.  He was fidgety in the chair and swinging his legs and moving his hands a bit, I would say."[193]   She thought DeMarigny was agitated because he was planning to leave Smith Barney,[194]   not that he had just aided and abetted the theft of more than $50 Million in exchange client funds for the benefit of McGhan.

133.   Donna Dunbar's reaction to the August 5, 2004 meeting and her primary concern to keep DeMarigny at Smith Barney are surprising in light of her notes from the meeting.  Dunbar kept meticulous notes from the conversation, in which the following topics were discussed:

"McGhan trying to buy Paris company closing June 30.  Can't get financing.  Acquires Southwest.  Cash cow to get this other company.  Extremely urgent that wire $ – no wonder!"

"PJ thinks institutional money financed Parisian purchase.  No reasonable explanation for Southwest acquisition.  Alan [Finney] may have caught on to the purpose of Southwest acquisition."

"PJ knew why $ going to UBS, now says no.  Either PJ drank the Koolaid, thinks we're stupid or is stupid himself."

134.   Based on the foregoing notes, one would not have expected the primary concern from the meeting to center around retaining DeMarigny as a broker of Smith Barney.

---

[192]   Deposition of Donna Dunbar at p. 15, line 24 – p. 16, line 11.

[193]   Deposition of Donna Dunbar at p. 34, lines 9-11.

[194]   Id. at p. 46, line 21 – p. 47, line 6.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTERS\MK3\7269.001\ (SORRELL\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

Nonetheless, both Donna Dunbar and Rob Perry (the other regional manager present at the meeting) were preoccupied with the idea that their highest producing broker DeMarigny was leaving Smith Barney and moving to another firm.

### TOO LITTLE, TOO LATE

135.   On August 6, 2004, the day after the meeting with Dunbar and Perry, Barron sent e-mail correspondence to DeMarigny setting forth Barron's understanding that the Southwest account was an "omnibus account with [Smith Barney] holding money of Southwest Exchange investors' funds." Smith Barney requested a copy of the Southwest client agreement in order to determine whether the wire transfers to Blackstone were "invested in accordance" with the client agreement. Barron informed DeMarigny that "any inflows into the account will be left in the money market funds until [Smith Barney] receive[s] investment policy statement." Barron advised DeMarigny that Smith Barney would no longer accept wire transfers unless those transfers stayed in the account for a minimum of thirty days.

136.   In reality, Smith Barney should have already possessed the Southwest client agreement and investment policy from the original opening of the Southwest account in 2002, and should have completely restricted the account on June 30, 2004. Nevertheless, DeMarigny predictably failed to provide any of the information requested in Barron's e-mail. Barron was not phased.

> **Q:**   Did you get concerned when the agreement between Southwest and its
> clients never arrived pursuant to your request?
>
> **A:**   No.
>
> ***
>
> **Q:**   You're asking for an investment policy from Southwest Exchange, and
> you don't receive that either, correct?
>
> **A:**   Correct.
>
> **Q:**   Did you ever stop and think maybe something is wrong, something bad is
> going on here?

CONSOLIDATED CLASS ACTION COMPLAINT

1      A:      No, I did not.[195]

2      137.    By the time Smith Barney and Barron requested the Southwest client agreement

3  and the investment policy statement for Southwest, McGhan and DeMarigny had diverted

4  approximately $52 Million from the Southwest account.  The damage was done.  Only $2.3

5  Million of client money remained in the Southwest account, along with $2 Million invested in

6  two, separate hedge fund products.

7                    **THE TERMINATION OF THE SOUTHWEST ACCOUNT**

8      138.    On or about August 10, 2004, AML made the recommendation to Barron to

9  terminate the Southwest account.[196]  The AML department communicated to Barron that Smith

10  Barney decided to terminate Southwest over concerns that McGhan had perpetrated a fraud.[197]

11  Barron took notes regarding the type of language to use with McGhan in terminating the

12  account, *i.e.* "our firm has made a business decision to discontinue the relationship," and "you

13  are a good guy."

14     139.    On August 11, 2004, Smith Barney placed Southwest and "good guy" Don

15  McGhan on its BADI list (an internal Smith Barney list of prohibited clients).  Smith Barney

16  also placed Ted Maloney, CRMC, Medicor and Blackstone on the BADI list of prohibited

17  clients, thereby cementing Smith Barney's full knowledge of the fraud and its participants.

18     140.    Despite the BADI list, and his discussions with AML, Barron refused to

19  acknowledge that the fraudulent activity within the Southwest account played any role in the

20  termination of the Southwest account, stating that account "inactivity" was the only reason he

21  could recall for the termination of Southwest as a Smith Barney client.[198]   "Well, we just

22  didn't see where there was going to be any business or any revenues generated from the

23

---

24  [195]  Deposition of Robert Barron at p. 606, line 21 – p. 607, line 22.

25
26  [196]  Deposition of David McNair at p. 151, line 13 – p. 152, line 2. The recommendation for account termination occurred nearly a month and a half after Donna Dunbar submitted her chart of events to AML detailing the entire fraud.

27  [197]  Id. at p. 91, lines 10-14.

28  [198]  Deposition of Robert Barron at p. 129.

**CONSOLIDATED CLASS ACTION COMPLAINT**

account."[199]   It was "no longer in our best interest to have Southwest as a client."[200]   Smith Barney was not earning any money on the Southwest account and therefore the account was "serving no business purpose."[201]

141.   On August 19, 2004, Barron finally reached McGhan and informed him that Smith Barney "would do whatever we could to facilitate transfer to another house. . ."   Barron spoke with McGhan about how to transfer "the *little things* that were left in the account to UBS."[202]   The "little things" were the two hedge fund investments worth $2 Million, and the $2.3 Million of client money wired out of the account that day.   Smith Barney assisted Southwest with the liquidation of the hedge fund investments and transferred $2 Million to UBS, thus fully draining every penny of exchange client money from account at Smith Barney.

### DeMarigny Continues the Fraud at UBS

142.   One day after Smith Barney terminated the Southwest account purportedly for "account inactivity," PJ DeMarigny sent a letter of resignation to Barron.   Barron testified that he did not draw a connection between the termination of the Southwest account at Smith Barney and the departure of DeMarigny to UBS the next day.[203]

**Q:**   Did you make any connection between PJ's departure to go to UBS with the fact that the money that had been transferred out of Southwest Exchange's account at Smith Barney went to UBS?

**A:**   I did not.

**Q:**   Sitting here today, do you make a connection between the two?

**A:**   No.[204]

---

[199]   Id. at p. 129, lines 10-12.

[200]   Id. at p. 113, lines 21-23.

[201]   Id. at p. 128, lines 21-23.

[202]   Deposition of Robert Barron at p. 114, lines 6-8.

[203]   Deposition of Robert Barron at p. 731, lines 13-20.

[204]   Deposition of Robert Barron at p. 731, line 23 – p. 732, line 5.

**CONSOLIDATED CLASS ACTION COMPLAINT**

143.   On August 20, 2004, Barron spoke with UBS personnel regarding the transfer of DeMarigny's securities license to UBS.  The purpose of the conversation was to inform UBS whether or not DeMarigny was the subject of any pending investigation that would prevent the clean transfer of license.

> **Q:**   It's a very simple conversation.  They called and said, PJ DeMarigny is coming to work for us.  Is there anything that would prevent transfer of his license?[205]

144.   In spite of all of the account activities related to Southwest Exchange, as well as the Schofield Letter and the AML investigation, Robert Barron informed UBS management that there was nothing that would prevent the transfer of DeMarigny's securities license to UBS. [206]   In fact, Barron completed a Form U5[207] for DeMarigny stating that DeMarigny had "voluntarily resigned" and was <u>not</u> under internal review for fraud, wrongful taking of property or violating investment-related statutes, regulations, rules or industry standards of conduct.[208] Barron's completion of a clean U5 was incredible in light of the Dunbar notes from August 5, 2004.   To the outside world (and to UBS in particular), a clean Form U5 signified that DeMarigny was on the up and up, an honest broker.  In reality, Smith Barney could not get rid of DeMarigny and Southwest fast enough.  "P.J. told me that he left because [Smith Barney] had said they didn't want McGhan as a client anymore, and, you know, where he went as a client *they didn't care*, but they didn't want him as a client anymore."[209]   And so DeMarigny and McGhan simply moved the operation to UBS, no questions asked, whereafter they stole the rest of the victims' 1031 exchange funds.

///

---

[205]  <u>Id</u>. at p. 737, lines 1-4.

[206]  <u>Id</u>. at p. 737, line 5.

[207]  Deposition of Robert Barron at p. 840, lines 14-24.

[208]  Robert Grossman claims to have contacted the FBI in August, 2004, regarding Southwest.  Grossman refused to reveal the content of any of his discussions with the FBI, asserting the SAR privilege.

[209]  Deposition of Tom Gilman at p. 26, lines 17-21 (*emphasis added*).

**CONSOLIDATED CLASS ACTION COMPLAINT**

# IX.

## ALLEGATIONS REGARDING NEGLIGENCE BY THE

## MEDICOR BOARD OF DIRECTORS

145.    Prior to McGhan's involvement with SWX, Defendants Thomas Hartley ("Hartley") and Mark Brown ("Brown") had knowledge of problems associated with International Integrated Industries (III) and McGhan's use of diverted funds in the MDA litigation.[210] Both Mark Brown and Thomas Hartley participated on the MDA board convened to deal with the 'MDA receivership and both had knowledge of McGhan's improper funneling of diverted funds from MDA through III into Inamed.[211] Unfortunately, as Members of the MDCR board, Hartley and Brown abdicated their roles on. the audit committee and accepted funds from III without the requisite due care in determining the true source of the III funds. Indeed, Hartley and Brown had reason to suspect the legitimacy of the III funds infused into Medicor.

146.    At fiscal year end 2003, Medicor was losing money at a rate of $5 Million per year.[212]    At the time, Medicor's sole source of income came from a subsidiary called Biodermis, which manufactured an adhesive scar reduction product analogous to a band-aid used to reduce scars from plastic surgery.  Nonetheless, despite its poor financial condition, Medicor entered into a definitive deal to purchase a French breast implant company called

---

[210]   During depositions, both Thomas Hartley and Mark Brown admitted to participating on the board of directors for Medical Devise Alliance, Inc. ("MDA") in 2000, when the MDA shareholders filed suit against McGhan for allegedly diverting funds from one McGhan related entity (MDA) to another McGhan related entity (Inamed) by using III as an intermediary to funnel money.

[211]   Mark Brown made a special appearance at a bankruptcy hearing in Santa Barbara, CA, in which he testified under oath that he had "serious concerns" regarding McGhan's actions and the diversion of funds from MDA through III to Inamed.  Similarly, Hartley was aware of the allegations in the MDA action and acknowledged the "serious concerns" with McGhan as expressed by Mark Brown:

> **A:**    I think we all had the same feelings that he [Brown] expressed here.
>
> **Q:**    And those would be that there were serious issues regarding Mr. McGhan?
>
> **A:**    That needed to be pursued, yes.

[212]   This fact is supported by the testimony of Ted Maloney (CEO of MEDICOR) and the SEC filings for MEDICOR for the fiscal year ending 2003.

F:\MATTER\W K3\7260.001- (SORRELL)\7260.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

Eurosilicone for $50 Million on 'May 19, 2004. As a result, by May, 2004, Medicor made the quantum leap from a struggling start-up selling band-aids to one of the largest breast implant manufacturers in the world.

147.    By May, 2004, Medicor did not have the public financing to complete the acquisition of Eurosilicone on the June 30, 2004 funding deadline.[213]   According to the testimony of Ted Maloney (CEO of Medicor), McGhan informed the Board of Directors that he would simply fund the acquisition of Eurosilicone himself using his own, personal wealth through III Shortly thereafter, McGhan began funneling millions of dollars into Medicor from now infamous III to fund the Eurosilicone acquisition.[214]

### *Brown and Hartley Failed to Properly Identify the True Source of The Funds from (III) and Failed to Prevent the Malfeasance of McGhan In the Financing of the Eurosilicone Transaction with Stolen Money.*

148.    As members of the Medicor audit committee, Mark Brown and Thomas Hartley had an obligation to know the facts and circumstances surrounding the largest acquisition in the company's history. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (overruled on other grounds).   Based on their own deposition testimony, Hartley arid Brown were clueless. The documents produced in this case demonstrate, that the money used to make the single largest acquisition in Medicor s history never even hit a Medicor bank account Hartley believed that Medicor verified the funding of the Eurosilicone transaction with documentation or "even a wire" of the III money.

**Q:**    Well, I know.  But the question is, is if the money never flows through Medicor how can it internally account for the purchase of Eurosilicone on its books and records?

**A:**    I have no idea what the – *there would be some documentation, even a wire*

---

[213]   Don McGhan testified that neither Galen Partners, nor Frasier Medical could provide financing for the acquisition of Eurosilicone in time to meet the funding deadline.  McGhan's testimony is supported by documents produced in this case.

[214]   The evidence demonstrates that the III funds originated from the Southwest Exchange accounts at Silver State Bank and Solomon Smith Barney.

**CONSOLIDATED CLASS ACTION COMPLAINT**

*and so forth.* The other side of the transaction perhaps, was – well, I'm not sure, but all the transactions I have seen in – in Medicor are the properly recorded loans from McGhan or McGhan entities, of which Triple is the only one that I recognized the name of when I saw all these named in these depositions that I had never seen.

149.   Based upon the foregoing testimony, Hartley believed that the Eurosilicone transaction was funded by a loan from McGhan through III to Medicor. Hartley also believed the funds were properly recorded on the Medicor books and records. They were not.[215] Accordingly, Hartley failed to pin down the true source of the funds used to make the single largest acquisition in Medicor history and fundamentally failed in his role on the audit committee. Though Hartley had a "duty to inform [himself], prior to making a business decision, of all material information reasonably available to [him],"[216] Hartley accepted McGhan at his word that III funded the Eurosilicone transaction and that III funds were in fact, derived from McGhan's own, personal wealth — the same false representations made by McGhan to Inamed in the MDA debacle. Hartley had no reasonable basis to rely on McGhan in light of his experience on the MDA board and therefore abdicated his role as an independent director" on the audit committee to *independently* scrutinize the Eurosilicone transaction

150.   Brown similarly abdicated his role as a Medicor board member to *independently* scrutinize the Eurosilicone transaction At the time Medicor purchased Eurosilicone, Brown functioned as the only "independent director' of the Medicor board Though Brown had a duty to inform himself of all material information regarding the transaction, including who would fund the purchase, Brown was clueless as to the source of the funds used to finance Medicor's business.

///

---

[215]   Although the bank records from UBS reveal that Blackstone Limited, LLC funded the Eurosilicone transaction, none of the records for Medicor (an SEC reporting company) mention an outstanding obligation to Blackstone Limited, LLC, or identify Blackstone as having funded the Eurosilicone transaction on behalf of Medicor.

[216]   *Aronson*, 473 A.2d at 812.

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTER\W3\7269.001- (SORREL L)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

| | |
|---|---|
| **Q:** | Did you ever try to determine the source of the money McGhan was pumping into the company [Medicor]? |
| **A:** | No. |
| **Q:** | Did you ever ask any questions about that? |
| **A:** | No. |
| **Q:** | I mean, you're familiar coming from the gaming arena that it's real important to track the source of funds, isn't it |
| **A:** | Sure. |
| **Q:** | Because you don't want funds coming from the wrong place, right? |
| **A:** | Correct. |

151.   Mark Brown clearly understood the importance of ascertaining the source of the funds infused into Medicor. Yet, despite McGhan's prior history of diverting funds through III, Brown failed to create any internal controls to establish or identify the source of the funds used to finance Medicor as a going concern Moreover, Brown failed to create any internal controls to prevent the improper transfer of money from one McGhan related entity to another — something that Brown personally witnessed in the MDA case. Simply put, Brown took McGhan at his word and failed to discharge his duty as an "independent" director on the Medicor Board

152.   Nothing illustrates Mark Brown's total abdication of director responsibility more than his own testimony in this case.  On paper, McGhan's infamous company III funded nearly all of Medicor's operations from 2003 until 2006,[217] yet by his own admission, Mark Brown knew absolutely nothing about III as a company.

| | |
|---|---|
| **Q:** | What did you know about this company [III] at all when you sat on the [Medicor] board? |
| **A:** | Nothing. |
| **Q:** | Well, the audit committee – it's not the responsibility of the board to make |

---

[217]   In or about April, 2006, Medicor obtained public financing in the amount of $50 Million form the Angelo Gordon hedge fund in New York City.

**CONSOLIDATED CLASS ACTION COMPLAINT**

1    sure that the money that's coming into the company is clean?

2    **A:**    Well, obviously , if there's something that leads us to believe that, but we

3        had nothing to lead us to believe that the money was anything out of how

4        Don McGhan represented that.

5    **Q:**    How did he represent it?

6    **A:**    It was his personal funds.

7    153.    Even Mark Brown conceded that the MDCR BOD would have a responsibility

8    to protect against the influx of improper funds into Medicor "if there's something that leads to

9    believe that . . ."  Brown should have investigated the source of the funds allegedly coming

10    from III into Medicor in light of the past problems with McGhan and III.

11    154.    Based upon the foregoing testimony, Mark Brown (the so-called "independent"

12    member of the board of a publicly traded company) did not have the slightest clue about the

13    single largest financing source for Medicor as a going concern.  He did no diligence on III and

14    knew nothing about the company.  That is the very definition of total abdication of one's role

15    as a director, and gross negligence in light of Mark Brown's history on the MDA board and the

16    role that III played in the MDA litigation.

### Brown Hartley Failed to Properly Protect the Southwest Exchange Clients
### As Creditors of Medicor in their Decision to Subordinate the III "Debt" to the
### $50 Million Loan from the Angelo Gordon Hedge Fund.

19    155.    Beyond accepting stolen money into Medicor, Hartley and Brown compounded

20    the problem and committed gross negligence by agreeing to subordinate the III "debt" to the

21    infusion of $50 Million by the hedge fund Angelo Gordon.  For McGhan, Medicor's decision

22    to subordinate the III "debt" to Angelo Gordon was easy, since all of the money in III came

23    from Southwest Exchange.  However, for Hartley and Brown (the independent members of the

24    audit committee) the decision should have required deep insight and consideration from a

25    business standpoint.

26    ///

27    ///

28    ///

**CONSOLIDATED CLASS ACTION COMPLAINT**

156.    When Angelo Gordon infused $50 Million into Medicor, the Southwest Exchange clients I were the single largest creditor of Medicor.[218]   At that point in time, Medicor was a company in deepening insolvency losing $5 Million per year Medicor had never made a profit and continued to lose millions of dollars annually Despite the poor financial condition of Medicor, and based upon nothing more than McGhan s word, Hartley and Brown subordinated the III "debt" to Angelo Gordon, thereby making the clients of Southwest unsecured creditors of Medicor and effectively foreclosing any chance that the Southwest clients could recover their money from Medicor.

157.    Hartley and Brown owed a duty to the creditors of Medicor prior to accepting the $50 Million from Angelo Gordon. *See North American Catholic Programming Foundation Inc v Gheewalla,* 930 A 2d 92 (Del 2007)(holding creditors of insolvent corporation had standing to maintain claims for breach of fiduciary duty against directors of insolvent corporation).[219]   They failed to discharge any independent oversight of the deal, or to recognize the Southwest Exchange clients' interest in the subordination of the III debt.

### 3.    Harley and Brown Improperly Relied on Stuart Greenberg & Co.

158.    Thomas Hartley and Mark Brown, as members of the Medicor audit committee, improperly relied upon the representations of Stuart Greenberg & Company, the outside auditor for Medicor, in discharging their duties on the audit committee.

159.    During his deposition, Brown testified that he believed Hartley (the chair of the audit committee) reviewed McGhan's personal wealth on a yearly basis with Stuart Greenberg & Co. in order to determine whether or not McGhan had the ability to fund Medicor as a going concern.[220]   However, Stuart Greenberg testified that he did not recall conducting an annual

---

[218]   International Integrated Industries (III) was never the real creditor of Medicor, since all of the money used to purchase Eurosilicone came directly from Southwest Exchange.

[219]   The Medicor BOD claim members that they did not owe a duty to the clients of Southwest since the Board did not know Southwest was a Medicor creditor (*i.e.* that III money was really Southwest money). However, such an argument simply begs the question as to why the independent board did not properly ascertain the true source of the money coming from III as discussed above.

[220]   **Q:**    And on the audit committee year after year you approve his [Stewart Greenberg's] hiring?

    **A:**    Yeah.

**CONSOLIDATED CLASS ACTION COMPLAINT**

meeting with McGhan regarding his financial wherewithal and did not have any work papers regarding the 2004 audit of Medicor evidencing any verified financial statements for Don McGhan.  In fact, Stuart Greenberg possessed only one, unaudited financial statement for McGhan from 2003 and never obtained an updated version of the document for any ensuing year.

160.    Hartley's reliance on Greenberg was unwarranted.  A simple probing of Stuart Greenberg would have revealed that Greenberg did not have the information necessary to confirm McGhan's financial condition or wherewithal.  Greenberg had no verifiable financial statements for McGhan for any relevant timeframe, including 2004 when III purportedly funded the single largest acquisition in Medicor history.

161.    Even Hartley could not deny the important role played by the audit committee in the oversight of Medicor's operations and financing.  Ultimately, Harley candidly acknowledged that Medicor should have possessed proper documentation reflecting the source of the financing for the Eurosilicone acquisition and therefore could not put the blame on the auditor of Medicor.

> Q:    In your experience, an auditor would have to have source documents from a bank?
>
> A:    Some kind of source documents, yes.
>
> Q:    Which would be representation by a neutral third party who would have no interest in the transaction, like a bank?
>
> A:    Ideally.
>
> Q:    Ideally.  Okay.
>
>    And if Greenberg didn't have this information and went ahead and

> Q:    And he's the one who is charged with the responsibility of determining whether McGhan has the ability to fund the company?
>
> A.    Correct.
>
> Q:    And you're –
>
> A.    And Tom Hartley who chaired, I think, also would review at some level that – whether it was his, Greenberg's report, or he reviewed direct documentation, I'm not sure.

**CONSOLIDATED CLASS ACTION COMPLAINT**

A:     Well, more – let me interrupt. ***

*More importantly, the company should have this. I mean, we're putting this on the auditor. The auditor is supposed to be reviewing what the company's records are. First of all, the company should have this kind of information which he would have the opportunity to review.* So it wouldn't be that the auditor was supposed to get this kind of information. It would be a question that he would ask of – if he felt the records were incomplete because of where the transaction came from. I think that's a reasonable question to ask.

162.   Simply put, by Hartley's own admission, Medicor (and the Medicor BOD) should have possessed the records evidencing the source of the funds used to purchase Eurosilicone. It did not. Instead, Medicor had nothing more than a McGhan created "Revolving Promissory Note" between III and Medicor, with no documentation to support that III actually funded the Eurosilicone acquisition with McGhan's personal assets. Incredibly, Medicor did not even possess a bank statement showing that the funds actually left III to fund the Eurosilicone transaction.[221] The Medicor BOD approved the funding of the Eurosilicone deal on McGhan's word with **no source documentation**. That is the very definition of total abdication of the board and audit committee responsibility. *See Aronson*, 473 A.2d at 912 (holding that "directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them [and], having become so informed, they must then act with requisite care in the discharge of their duties.") Hartley and Brown acted with gross negligence in their role as "independent" directors and members of the audit committee for Medicor.

///

///

///

---

[221]  Had the MDCR audit committee properly documented the Eurosilicone transaction, it would have discovered that III did not fund the Eurosilicone deal as represented by McGhan. Southwest Exchange funded the Eurosilicone transaction through Blackstone.

CONSOLIDATED CLASS ACTION COMPLAINT

## X.

## CLASS ACTION ALLEGATIONS

163.    Plaintiffs bring this action on their own behalf and as class representatives pursuant to Federal Rule of Civil Procedure 23.  The class and Sub-Class are defined, for now, as follows:

a.      All persons who entered into an Exchange Agreement with SWX, deposited funds with SWX or had their 1031 exchange funds deposited with SWX and have been deprived of the access to those funds held in trust (the "Class").

b.      All persons who entered into an Exchange Agreement with QES, deposited exchange funds with QES, and have been deprived of the access to their funds held in trust (the "Sub-Class").

164.    Excluded from the definition of the Class and the Sub-Class are the Defendants and any person, corporation, or other entity related to, controlled by or affiliated with any defendant.  Included in the term "persons" in the definition of the Class are entities and representatives of these entities.

165.    The members of the class are so numerous that joinder of all of them is impracticable.  There are at least 130 victims of the Defendants' conduct residing in several states, including California, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Maine, Missouri, New Jersey, New Mexico, Nevada, New York, Oregon, Texas, Utah, Washington, and other states.

166.    There are questions of law and fact which are common to the class and Sub-Class and which predominate over questions affecting any individual class or Sub-Class member. The common questions include, *inter alia*, the following:

a.      Whether the Exchange Accommodator Defendants breached Exchange Agreements by failing to fund the escrows to purchase the replacement property as promised to each client;

///

///

**CONSOLIDATED CLASS ACTION COMPLAINT**

b.   Whether the Exchange Accommodator Defendants and/or the Negligent QES and SWX Employee Defendants breached their fiduciary duties by failing to protect the trust res of each client;

c.   Whether the Smith Barney, Silver State Bank, Medicor, Brown and/or Hartley aided and abetted the Thief Defendants and SWX in breaches of fiduciary duty owed by SWX to class members by allowing SWX to withdraw Exchangers' funds from accounts maintained by SWX at Smith Barney, Silver State Bank and/or UBS;

d.   Whether Medicor, Brown and/or Hartley aided and abetted the Thief Defendants and QES in breaching fiduciary duties owed by QES to class members;

e.   Whether DeMarigny and/or Smith Barney conspired with the other Thief Defendants to breach fiduciary duties owed by SWX to class members;

f.   Whether the Thief Defendants stole, embezzled and/or converted the trust res of each client;

g.   Whether Defendants Smith Barney and/or Silver State aided and abetted SWX and the Thief Defendants in converting class members funds deposited in accounts maintained by SWX at Smith Barney, Silver State Bank and/or UBS;

h.   Whether Smith Barney and/or Silver State Bank aided and abetted SWX in its failure to comply with NRS §205.960 in allowing Defendant SWX to withdraw Exchangers' funds without their written consent from accounts maintained by SWX at Smith Barney, and/or Silver State Bank;

i.   Whether the Thief Defendants committed fraud in order to steal the trust res of each client;

///

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTER\WK3\7269.001- (SORRELL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

j.  Whether the Thief Defendants and others including Smith Barney were participants in a RICO enterprise which damaged the clients' business or property;

k.  Whether Smith Barney is vicariously liable for the tortious acts of DeMarigny performed within the course and scope of his employment with Smith Barney;

l.  Whether Smith Barney is directly responsible for failing to safeguard the trust assets and by ratifying DeMarigny's tortious conduct;

m.  Whether the Negligent SWX and QES Employee Defendants breached their personal obligations owed to the class and/or Sub-Class members by not protecting entrusted funds for their own personal gain;

n   Whether the non-BFP Transferee Defendants received stolen trust funds in knowing breach of trust; and

o   Whether Smith Barney was negligent in allowing class members funds to be withdrawn from accounts maintained by Defendant SWX at Smith Barney.

167.  The claims of Plaintiffs are typical of the claims of the class and Sub-Class as a whole. Plaintiffs are members of the class and Sub-Class and have suffered harm and are likely to continue to suffer harm due to the loss of entrusted funds.

168.  Plaintiffs will fairly and adequately protect the interests of the class and Sub-Class. The interests of Plaintiffs are consistent with and not antagonistic to the interests of the class or Sub-Class. Combined, the representative Plaintiffs have lost over $5,000,000 and have sought out and retained counsel experienced in complex class Actions and receiverships in an effort to get their money back. Plaintiffs have agreed to act for the benefit of all of the victims similarly situated and not to put their individual interest ahead of any member of the class or Sub-Class.

73 of 88

CONSOLIDATED CLASS ACTION COMPLAINT

E:\MATTERS\MX317269.001~ (SORREL) \X7269.007 Transferred Litigation.USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

169.    The prosecution of a multitude of separate actions by individual members may establish incompatible standards of conduct for the parties opposing the class and Sub-Class, may substantially impair or impede the interests of other members of the class and Sub-Class to protect their interests, and will result in waste.

170.    The acts and actions of Defendants applicable to the Plaintiffs apply generally to the class and Sub-Class, thereby making the final relief granted by the Court to the Plaintiffs applicable to the class and Sub-Class as a whole.

171.    This Class Action would be superior to other available methods for the fair and efficient adjudication of the controversy between the parties.  The interest of most members of the class and Sub-Class in individually controlling the prosecution of separate actions appears low, due to the complexity of the case.  Most members would be unable or unwilling to individually prosecute an action without joining their claims with other claimants which is generally difficult.  The amount of damages at stake for each victim varies radically from a few hundred dollars to $22,000,000.  Claimants with excessively large claims will most likely opt out and prosecute their own cases. Separate suits on the smaller claims would be impractical yet settlements with insurers and the Banking Defendants will require complete closure of all claims by all claimants favoring the use of the Class mechanism.  Concentrating litigation in this forum will also promote judicial efficiency.

172.    This proposed Class Action is manageable.   There are approximately 133 victims with relatively large claims compared to most Class Actions involving a multitude of claimants with minimal claims.  Participation in the case by class members who do not opt out will be assured by the size of the loss sustained by each member.

///

///

///

///

///

///

**CONSOLIDATED CLASS ACTION COMPLAINT**
F:\MATTER\WK3\7269-001- (SORRELL)\7269-007 Transferred Litigation \USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

# XI.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Violations of 18 U.S.C. § 1962 (c) - - Civil RICO

(Against the Thief Defendants, Smith Barney and

the Non-BFP Transferee Defendants)

173.    Plaintiffs incorporate paragraphs 1 through 172 above as if fully set forth herein.

174.    The Thief Defendants (McGhan, McGhan Jr., DeMarigny, Pomeroy, Sperberg and Maloney), Smith Barney and the Non-BFP Transferee Defendants (Blackstone, Capital Reef, Global Aviation and I.I.I.) which are collectively referred to herein as the "RICO Defendants", are all persons within the meaning of 18 U.S.C. § 1961 (3), and are the persons involved in the creation and maintenance of a racketeering enterprise as defined in §1961(4). The RICO Defendants, and each of them, have been employed by and/or associated with the enterprise and while so employed and/or associated have conducted, directed, managed or participated in, either directly or indirectly, the conduct of the affairs and business of the enterprise affecting interstate commerce through the described pattern of racketeering activity.

## A.    The Fraudulent Scheme

175.    The fraudulent scheme was to purchase SWX, gain access to its trust funds, steal a large percentage of the trust assets, conceal the theft through corporate machinations and related entity transfers, invest the funds in potentially profitable business enterprises including Medicor Ltd., jets and real estate, reap the benefits of these investments, and use the cash for their own lavish lifestyle;  all before the real estate market cooled and the trust assets had to be replaced or the fraud would be discovered.  The scheme to steal SWX assets was successful so it was expanded to include the fraudulent purchase of other Exchange Accommodators, including NNE in October 2004 and Arrow in the summer of 2005 and the immediate theft of their assets held in trust.  The scheme began to fail in late 2005 with the cooling of the real estate market, the April 2006 liquidity crises at SWX, and the lack of profitability of the businesses in which the enterprise invested its stolen funds.  Notwithstanding the imminent

F:\MATTER\WK3\7269.001- (SORREL) \17269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1  collapse of the scheme, the Thief Defendants purchased QES on October 20, 2006 based on

2  wire fraud and mail fraud, and looted its trust assets before terminating the 4-year long criminal

3  enterprise.

4  **B.    The RICO Enterprise**

5       176.    The enterprise is a group of persons and entities associated together for a

6  common purpose of engaging in a course of conduct.   The structure of the enterprise is

7  consistent with that of an organized crime family with the McGhan family at the core (the inner

8  sanctum as described by Maloney) and confederate soldiers on the periphery.   The enterprise

9  consisted of the Thief Defendants, the Non-BFP Transferee Defendants, the Exchange

10 Accommodator Defendants with their negligent employees acting for their individual

11 advantage and gain, and the corruptible DeMarigny along with his employer, Smith Barney.

12 Each person employed by or associated with the enterprise had separate identities to the

13 enterprise itself.   Each person associated with the enterprise managed and directed specific

14 components of the enterprise, each component being critical to the success of the enterprise

15 itself.   However, if one member of the enterprise left the enterprise it would continue as an

16 ongoing criminal enterprise until stopped by law enforcement.

17      177.    The enterprise operated out of a suite of offices located at 4560 S. Decatur Blvd.

18 in Las Vegas, Nevada but conducted its affairs in various locations in the United States by

19 using interstate commerce and affecting interstate commerce and was at all times an enterprise

20 as defined in 18 U.S.C. § 1961 (4).

21 **C.    The Pattern of Racketeering**

22      178.    In furtherance of the ongoing scheme, the RICO Defendants, and each of them,

23 conspired to commit and/or committed hundreds if not thousands of predicate acts or aided and

24 abetted in the commission of predicate acts as proscribed by 18. U.S.C. § 1961(1)(b) between

25 June 2004 and January 2007, including mail fraud, wire fraud and money laundering.

26      179.    There are hundreds if not thousands of predicate acts described with specificity

27 in the Complaint.   Examples are summarized herein as follows:

28

**CONSOLIDATED CLASS ACTION COMPLAINT**

F:\MATTERS\K317269-001- (SORRELL)\7269-007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

- June 12, 2004 - wire fraud committed when Sperberg set up the meeting with Kincaid by calling Kincaid on an interstate call from Las Vegas, Nevada to Chicago, Illinois.  Based on this call, McGhan, Pomeroy, Maloney, McGhan Jr., Sperberg and Keys flew to Chicago to meet Kincaid to defraud her out of control over the SWX trust accounts by falsely representing to Kincaid in the written Purchase Agreement that Capital Reef would purchase SWX to operate it as an "Exchange Accommodator", not to steal its assets.

- June 29, 2004  - wire fraud committed by DeMarigny (employee of Smith Barney) when he wired $5,000,000 from SWX account #xx5563 at Smith Barney in Las Vegas, Nevada to the Blackstone account #VBxx8414 in Santa Barbara, California. The wiring of funds from Smith Barney to UBS would require the use of the Federal Reserve wire network, Smith Barney's bank, the Federal Reserve, and UBS's bank. DeMarigny falsely represented to Smith Barney's bank that the $5,000,000 transfer was authorized by SWX (false because the money was entrusted to SWX, not to "invest" in a bogus entity, and a felony for SWX pursuant to N.R.S. §205.960). DeMarigny's false statements on the necessary documentation to Smith Barney's bank caused the wire of the money to UBS's bank using the Federal wire.

- June 30, 2004 - wire fraud committed by DeMarigny when he wired $24,000,000 from SWX account #xx5563 at Smith Barney in Las Vegas, Nevada to the Blackstone account #VBxx8414 in Santa Barbara, California.  The same fraudulent representation of authority to transfer the $24,000,000 had to be made by DeMarigny to effectuate this transfer and many others.

- July 1, 2004 - wire fraud and money laundering committed by Pomeroy when she wired $26,000,000 to Mr. Tourniaires in France to the credit of Eurosilicone for Medicor Ltd.'s purchase of this subsidiary.  Pomeroy falsely represented to Mr. Tourniaires through his bank, Banque BNP Paribas that the $26,000,000 was Medicor Ltd.'s money when it was not.  The money laundering involved the use of proceeds greater than $10,000 obtained by wire fraud with the source of the proceeds concealed

CONSOLIDATED CLASS ACTION COMPLAINT

to hide the theft.  Because McGhan could not invest SWX money directly into Medicor Ltd., he used Blackstone's account at UBS as a device to make the investment without disclosing its source.

• June 29, 2004 to January 2007 – countless instances of money laundering by DeMarigny, Pomeroy and McGhan from June 29, 2004 through to the end of July 2007

• Mail fraud committed by DeMarigny and by Pomeroy, McGhan and McGhan Jr. as employees or agents of SWX by directing the mailing of Exchange Agreements to each client of SWX.  The representations mailed were false and known to be false by DeMarigny, Pomeroy, McGhan and McGhan Jr. because they were not going to use the funds received to close the escrow of the clients' replacement property.  Instead, they were going to steal the money or use the money to pay for the close of escrows of other clients of SWX who already had their money stolen.  There were hundreds, if not thousands, independent acts of mail fraud committed each month over a 2-year period and these acts also constitute interstate wire fraud because of telephone calls made by the clients to SWX and the use of the wires to transfer these funds to SWX.

• July 2006 to January 2007 - wire fraud and mail fraud committed by McGhan, Pomeroy and McGhan Jr. as agents or employees of SWX mailing and transmitting by wire across state lines on a daily basis the promotional brochure for SWX to clients and prospective clients of SWX claiming that clients' funds were protected by a $20,000,000 to $50,000,000 "bond" when they were not protected and the defendants knew it.

• October 20, 2006 - mail fraud and wire fraud committed by McGhan, Pomeroy, McGhan Jr. and Maloney in setting up the QES purchase from Amsler and Dawson with false representations regarding the purpose in making the purchase.

D. **Injury to Business or Property**

180.   As the actual and proximate cause of the conspiracy and operation of the enterprise, the RICO Defendants' association with the enterprise, the RICO Defendants conducting the affairs of the enterprise through the pattern of racketeering activity and

78 of 88

CONSOLIDATED CLASS ACTION COMPLAINT

E:\MATTER\WK3\7269.001- (SORRELL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

commission of the predicate acts committed by them, and each of them, Plaintiffs and the Class have had their properties and businesses damaged in amounts to be shown at trial including but not limited to the loss of their trust res which was a business asset for each of them.  Plaintiffs are entitled to treble damages.

## SECOND CLAIM FOR RELIEF

### Violations of 18 U.S.C. § 1962 (d) Conspiracy to Commit Civil RICO

(Against the Thief Defendants, Smith Barney

and the Non-BFP Transferee Defendants)

181.   Plaintiffs incorporate paragraphs 1 through 180 above as if fully set forth herein.

182.   The RICO Defendants, and each of them, have been employed by and/or associated with the enterprise and while so employed and/or associated, have conducted, directed, managed or participated in, either directly or indirectly, the conduct of the affairs and business of the enterprise through the described pattern of racketeering activity. The RICO Defendants, and each of them, have all conspired to participate in the RICO enterprise and have knowingly agreed to commit the predicate acts herein described, among others.

183.   As the actual and proximate cause of the operation of the conspiracy entered into by the RICO Defendants, and each of them, Plaintiffs and the Class have had their properties and businesses damaged in amounts to be shown at trial including but not limited to the loss of their trust res.  Plaintiffs are entitled to treble damages.

## THIRD CLAIM FOR RELIEF

### Theft/Conversion/Embezzlement

(Against the Thief Defendants and the Non-BFP Transferee Defendants)

184.   Plaintiffs incorporate paragraphs 1 through 183 above as if fully set forth herein.

185.   The Plaintiffs and each class member had trust funds on deposit with SWX, and members of the Sub-Class had funds on deposit with QES. Plaintiffs and each class member and Sub-Class member retained a superior possessory interest in their respective trust funds and retained the right to possession of those trust funds at the time of the close of their

79 of 88

CONSOLIDATED CLASS ACTION COMPLAINT

F:\MATTERS\WK3\7269-001-(SORRELL)\7269-007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

respective escrows to purchase Replacement Properties pursuant to the terms of the Exchange Agreements executed by each client.

186.    The Thief Defendants, and with the help of Smith Barney and the Non-BFP Transferee Defendants misappropriated, stole, embezzled and converted the trust funds to the detriment of Plaintiffs and each class member and Sub-Class member in an amount to be proven at trial.

187.    Neither Plaintiffs nor any class member or Sub-Class member consented to the theft, conversion and embezzlement of their trust funds and such conduct was a substantial factor in causing damages and harm to Plaintiffs and the class and Sub-Class including the loss of the trust res, the tax liability for failing to accomplish a 1031 exchange, the liability to the seller of the replacement property for breach, damage to credit ratings, and the need to hire and retain professionals and receivers to mitigate losses caused by the theft.  Plaintiffs seek and are entitled to the imposition of a constructive trust on the trust assets converted and retained by these Defendants.

188.    The herein described theft, conversion and embezzlement was done with evil intent and each defendant is guilty of oppression, fraud and malice toward the Plaintiffs and each class and Sub-Class member, whereby the Court should impose a penalty on Defendants to make an example of them to deter others from such behavior in the future.

### FOURTH CLAIM FOR RELIEF

#### Aiding And Abetting Conversion against

#### Defendants Smith Barney and Silver State Bank

189.    Plaintiffs incorporate paragraphs 1 through 188 as though set forth fully herein.

190.    N.R.S. 205.960 required SWX to deposit the Exchangers' trust funds in qualified escrow accounts as defined in 26 C.F.R. §1.1031(k)-1(g), and the trust funds once deposited could not be withdrawn from the escrow account without the written approval of both the Qualified Intermediary and the Exchanger for whom the Qualified Intermediary is holding the money. With knowledge that the Thief Defendants were converting the Exchangers funds, by *inter alia* not complying with N.R.S. 205.960 as alleged herein above, Defendants

Smith Barney and Silver State Bank aided and abetted the Thief Defendants and SWX and provided substantial assistance by allowing the Thief Defendants to withdraw the Plaintiffs' trust funds from accounts at Silver State Bank and Smith Barney without the permission of the Exchangers, for which assistance defendants Silver State Ban and Smith Barney were paid fees, commissions and charges from the Exchangers trust funds.

191.   As a direct and proximate result of the conversion aided and abetted by Defendants Silver State Bank and Smith Barney, Plaintiffs and each class member have individually suffered damages which combined total over $97,000,000 and also as a result of the conversion of their funds, Plaintiffs have been forced to retained legal services of attorneys, and are entitled to recover reasonable attorneys' fees and costs of litigation therefore.

192.   The aforementioned aiding and abetting was done intentionally with a willful and conscious disregard of Plaintiffs' rights and the rights of each class member.  Plaintiffs and each class member are entitled to an additional award of damages in the nature of exemplary damages against Defendants Silver State Bank and Smith Barney.

## FIFTH CLAIM FOR RELIEF

### Receiving Stolen Property

(Against the Thief Defendants and the Non-BFP Transferee Defendants)

193.   Plaintiffs incorporate paragraphs 1 through 192 above as if fully set forth herein.

194.   For their own financial advantage and gain, the Thief Defendants and the Non-BFP Transferee Defendants received and/or concealed the stolen SWX trust funds knowing that the funds had been misappropriated or stolen.

195.   The Thief Defendants' and the Non-BFP Transferee Defendants' conduct was a substantial factor in causing damages and harm to Plaintiffs and the Class including the loss of the trust res, the tax liability for failing to accomplish a 1031 exchange, the liability to the seller of the replacement property for breach, and the need to hire and retain professionals to mitigate losses caused by the theft.  The Court should impose punitive damages on Defendants to make an example of them to deter others from such behavior in the future.

CONSOLIDATED CLASS ACTION COMPLAINT

## SIXTH CLAIM FOR RELIEF

### Fraud & Deceit

(Against the Thief Defendants and Smith Barney)

196.    Plaintiffs incorporate paragraphs 1 through 195 above as if fully set forth herein.

197.    The Thief Defendants and Smith Barney Defendants, conspiring with each other, exercised control and dominion over SWX trust funds misappropriated them and knowingly issued or caused to be issued material misrepresentations to Plaintiffs or their agents that trust funds would be handled so that SWX would and could comply with the Exchange Agreements entered into with each client.  The Thief Defendants and Smith Barney also lied to Keys and other honest employees at SWX by concealing the theft of funds and representing that the trust funds on deposit at Smith Barney were being prudently invested and were safe to fund the close of all escrows of replacement property, which was false.  The misrepresentations were reasonably relied upon.

198.    The fraud of the Thief Defendants and Smith Barney Defendants caused the Plaintiffs to enter into the Exchange Agreements and induced SWX's honest employees to continue promoting SWX as a legitimate business with the ability to perform each and every Exchange Agreement which caused Plaintiff and class members to continue to entrust funds to SWX.

199.    The Thief Defendants and Smith Barney's fraud and deceit proximately caused damages to the Plaintiffs and the class in amounts to be shown at trial including but not limited to: (i) the loss of the trust res; (ii) tax liability; (iii) contract liability; and (iv) fees for professional advisors and attorneys.  These Defendants' conduct was despicable and malicious, entitling Plaintiffs to punitive damages.

## SEVENTH CLAIM FOR RELIEF

### Negligent Misrepresentation

(Against the Exchange Accommodator Defendants,

the Thief Defendants And Smith Barney)

200.    Plaintiffs incorporate paragraphs 1 through 199 above as if fully set forth herein.

**CONSOLIDATED CLASS ACTION COMPLAINT**

201.   The Exchange Accommodator Defendants, the Thief Defendants and Smith Barney exercised control and dominion over SWX trust funds and issued or caused to be issued material negligent misrepresentations that SWX would comply with the Exchange Agreements and the trust funds on deposit at Smith Barney were being prudently invested or failed to disclose the opposite and had a duty to disclose that Defendants SWX and QES were not investing the Exchangers' funds prudently.   The misrepresentations were reasonably relied upon by Plaintiffs or their agents.

202.   The negligent misrepresentations caused the Plaintiffs to enter into the Exchange Agreements and induced SWX's honest employees to continue promoting SWX as a legitimate business with the ability to perform pursuant to each Exchange Agreement and caused Plaintiffs and all class members to continue to entrust funds to SWX and QES.

203.   These Defendants' negligent misrepresentations proximately caused damages to the Plaintiffs and the class in amounts to be shown at trial including but not limited to: (i) the loss of the trust res; (ii) tax liability; (iii) contract liability; and (iv) fees for professional advisors and attorneys.

## EIGHTH CLAIM FOR RELIEF

### Breach of Contract

### (Against SWX and QES)

204.   Plaintiffs incorporate paragraphs 1 through 203 above as if fully set forth herein.

205.   The Plaintiffs and all Class Member entered into the Exchange Agreements with SWX or QES.

206.   The Plaintiffs and all Class members performed their promises pursuant to each Exchange Agreement, except to those matters which are waived or excused, and deposited trust funds or had trust funds deposited with SWX.

207.   As to the Plaintiffs and the Class, SWX breached the terms and conditions of each Exchange Agreement by failing and refusing to deliver the entrusted funds to close escrow on the purchase of the replacement property to the detriment of each client, proximately causing the damages mentioned herein, including the loss of the deposit, tax liability to the IRS, liability to

F:\MATTER\\\K317260.001- (SORREL).\\7260.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1    the third party seller of the replacement property, attorneys fees and tax complications requiring

2    expert advice to resolve.

3        208.    As to the Plaintiffs and the Sub-Class, QES breached the terms and conditions of

4    each Exchange Agreement by failing and refusing to deliver the entrusted funds to close escrow

5    on the purchase of the replacement property to the detriment of each client of QES, proximately

6    causing the damages mentioned herein, including the loss of deposits, tax liability to the IRS,

7    liability to the third party sellers of the replacement properties, attorneys fees and tax

8    complications requiring expert advice to resolve.

**NINTH CLAIM FOR RELIEF**

**Breach of Fiduciary Duty and Aiding Breach of Fiduciary Duty**

(Against all Defendants)

12        209.    Plaintiffs incorporate paragraphs 1 through 208 above as if fully set forth herein.

13        210.    For their own financial gain and advantage, all of the Defendants knowingly

14    induced, actively participated in, aided and/or abetted breaches of fiduciary duty owed to

15    Plaintiffs, the Class and the Sub-Class by all Defendants which proximately caused damages in

16    amounts to be shown at trial including but not limited to: (i) the loss of the trust res; (ii) tax

17    liability; (iii) contract liability; and (iv) fees for professional advisors and attorneys.    In

18    addition, Plaintiffs are entitled to the disgorgement of any profit or benefits received by

19    Defendants as a result of their breach of trust.

**TENTH CLAIM FOR RELIEF**

**Negligence**

(Against Hartley and Brown)

23        211.    Plaintiffs incorporate paragraphs 1 through 210 above as if fully set forth herein.

24        212.    Hartley and Brown owed a duty of care to Medicor creditors, including the

25    Exchangers, which they breached by allowing Angelo Gordon to infuse $50,000,000 into

26    Medicor while allowing the debt owed to the Exchangers to be subordinated in favor of Angelo

27    Gordon.    Hartley and Brown's negligence proximately caused damages to the Exchangers in

28    amounts to be shown at trial, including but not limited to: (i) the loss of trust res; (ii) tax

84 of 88

**CONSOLIDATED CLASS ACTION COMPLAINT**

1   liability; (iii) contract liability; and (iv) fees for professional advisors and attorneys.

## ELEVENTH CLAIM FOR RELIEF

### Negligence Per Se

(Against Defendant SWX for VIOLATION OF NRS §205.960, and Against

the Thief Defendants, Smith Barney and Silver State Bank, for Aiding and

Abetting SWX's Violation of NRS §205.960)

213.   Plaintiffs incorporate paragraphs 1 through 212 as though set forth fully herein.

214.   The Thief Defendants, Silver State Bank and Smith Barney knew at all relevant times that SWX was a Qualified Intermediary, SWX entered into written Exchange Agreements with its client Exchangers, and that the funds SWX deposited into its accounts at Silver State Bank and Smith Barney were being held by SWX as trustee for the Exchangers pursuant to the individual written Exchange Agreements.

215.   N.R.S. §205.960 was enacted by the State of Nevada for the protection of a particular class of persons, exchangers of qualified investment properties who wanted to complete a tax deferred exchange pursuant to IRC §1031 to acquire replacement investment property and thereby defer capital gains or ordinary income tax.  SWX did not comply with N.R.S. §205.960.

216.   Pursuant to subsection 1(b) of NRS §205.960 SWX was required to hold the funds from Exchangers in a qualified escrow account as defined in 26 C.F.R. §1.1031(k)-1(g), and pursuant to subsection 1(c) of NRS §205.960, the money was not to be withdrawn from the escrow account without the written approval of both SWX and the Exchanger whose funds were on deposit.

217.   Treasury Regulation §1.1031(k)-1(g)(3) provides that a qualified escrow account is an escrow account wherein the escrow holder is not the taxpayer or a disqualified person as defined in paragraph (k) of that section.  SWX's accounts at Smith Barney into which Exchangers' funds were deposited were not "escrow accounts" within the definition of Treasury Reg. §1.1031(k)-1(g)(3), and Silver State Bank and Smith Barney as the holders of escrow funds pursuant to N.R.S. §205.960 did not require SWX to obtain written authorization

CONSOLIDATED CLASS ACTION COMPLAINT

1   from clients before withdrawing client funds from accounts at Smith Barney and/or Silver State

2   Bank.

3       218.    Between 2002 and January of 2007, Defendant SWX, without the knowledge of

4   or pursuant to any written authorization from the Exchanger clients whose funds were on

5   deposit, withdrew the Exchangers' funds from the accounts at Defendants Silver State Bank

6   and Smith Barney used those funds for improper purposes.   Silver Stare Bank and Smith

7   Barney knew this and provided SWX with substantial assistance.

8       219.    As a direct and proximate result of the violations of NRS § 205.960 by SWX,

9   which violations were knowingly aided and abetted by the Thief Defendants and Defendants

10  Silver State Bank and Smith Barney, Plaintiffs and each class member have individually

11  suffered monetary damages as alleged herein.

12      220.    The plaintiffs fall within the class of persons for whom NRS § 205.960 was

13  intended to protect.

14      221.    Had SWX complied with NRS § 205.960 the misappropriation of SWX

15  exchange funds could not and would not have occurred.

16      222.    As a direct and proximate result of the statutory violation (negligence per se)

17  and the Thief Defendants; Silver State's and Smith Barney's aiding and abetting that violation

18  of NRS § 205.960 the plaintiffs have suffered damages as set forth herein.

19      223.    The injuries suffered by plaintiffs are the exact type of injuries against which

20  NRS § 205.960 was intended to protect.

21                          **TWELFTH CLAIM FOR RELIEF**

22              **For Negligent Supervision Against Defendant Smith Barney**

23      224.    Plaintiffs repeat and re-allege paragraphs 1 through 223 as though set forth fully

24  herein.

25      225.    In engaging in the conduct described herein, Smith Barney knew, or in the

26  exercise of reasonable diligence, should have  known that: (i) DeMarigny and other employees

27  of Smith Barney were unable to properly manage SWX trust assets and/or the 1031 exchange

28  funds on deposit at Smith Barney; (ii) DeMarigny and other employees at Smith Barney were

CONSOLIDATED CLASS ACTION COMPLAINT

1  not able to properly incorporate governing law (including N.R.S. § 205.960) into their business

2  practices; and (iii) DeMarigny's actions and inabilities and those of other Smith Barney

3  employees created an undue risk of harm to the Exchangers or trust beneficiaries and would

4  actually harm them unless Smith Barney adequately trained or supervised DeMarigny and

5  others in the exercise the tasks of their employment at Smith Barney.

6      226.   Notwithstanding the knowledge that governing law must be incorporated into

7  Smith Barney's business practices and that the activities and inabilities of DeMarigny and/or

8  other Smith Barney employees posed a risk of harm, Smith Barney did not adequately train or

9  supervise DeMarigny or the other employees in the exercise of the tasks pertaining to their

10  employment at Smith Barney.

11      227.   The failure of Smith Barney to adequately train and/or supervise DeMarigny

12  and other employees was the proximate cause of the Plaintiffs' damages in that proper training

13  and/or supervision would have caused DeMarigny and other Smith Barney employees to

14  manage SWX trust assets or Exchange money in such a manner that McGhan would not have

15  been able to loot it.  As a proximate result of Smith Barney's negligent supervision and/or

16  failure to properly train DeMarigny and others, Plaintiffs and Class members have suffered

17  damages as set forth herein and have retained the legal services of attorneys, and are entitled to

18  recover reasonable attorneys' fees and costs of litigation.

19                                         XII.

20                              **PRAYER FOR RELIEF**

21      WHEREFORE, Plaintiffs pray for Judgment against the Defendants as follows:

22      1.     For certification of the class and Sub-Class as defined;

23      2.     For the appointment of Plaintiffs as Class Representatives and Plaintiffs' counsel

24  as counsel for the class and Sub-Class;

25      3.     For damages to Plaintiffs and class members measured by the loss of their

26  property held in trust including consequential damages and  the disgorgement of unjust profits;

27      4.     For treble, exemplary and/or punitive damages, as applicable;

28      5.     For pre-judgment interest;

        6.     For costs of this action, including reasonable attorneys' fees as afforded by any

CONSOLIDATED CLASS ACTION COMPLAINT
E:\MATTERS\K3\7269.001. (SORREL)\7269.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc

1   applicable law;

2       7.    For the payment of fees and costs incurred by the Receiver;

3       8.    For the imposition of a constructive trusts and the avoidance of fraudulent

4   conveyances; and

5       9.    For all other relief the Court deems just and proper.

6

7   Dated: December 30th, 2008        HOLLISTER & BRACE
                            A Professional Corporation

8

9                               By: _____

10                              ROBERT L. BRACE
                            MICHAEL P. DENVER

11

12                              BAILUS COOK & KELESIS, LTD.

13

14                              By: _____

15                              MARC P. COOK

16

17                              FOLEY BEZEK BEHLE & CURTIS, LLP

18

19                              By: _____
                            THOMAS G. FOLEY, JR.

20

21

22

23

24

25

26

27

28

**CONSOLIDATED CLASS ACTION COMPLAINT**

E:\MATTER\W3\7268.001- (SORREL) W7268.007 Transferred Litigation USDC Nev. Case No. 01394\Pleadings\Consolidated Class Action Complaint\Consolidated Complaint 12-23-08.doc